LIPSCOMB, J.
There were several bills of exception taken on the trial, and many grounds of error have been presented for our consideration. I propose, however, before examining them, to first discuss the grounds on which the corporation relies in support of the claim it has set up to the lands in controversy. And first, the ancient grant. The existence of an ancient deed in the archives of the corporation, embracing the lands in controversy, has been proved conclusively. That this deed was in tiie archives, the place to which it belonged, as late as the year 1834, is also fully proved; that it purported to be absolute and unconditional on its face, emanating fz-om the authority of the King of Spain'; that it bore date in tiie year 1733 or ’34; that it was sewed or stitched into a book, with other papers relating to the foundation of the town; that among others was a paper relating to the introduction, at the royal expense, of fifteen families from the Canary Islands, who were the first settlers of the town; that the deed was the hist in tiie book; that on an occasion of very great public excitement, when the indignation of tiie people was aroused by what they supposed to be an attempted fraud on their rights by their delegate to the Congress of Coaliuila and Texas, Balmacida, in procuring a decree of tiie Congress fob two leagues of land to tiie town, tiie corporate authorities instituted á vigilant search for the deed and found if, as previously stated ; this was in tiie year 1829. It lias never been seen since 1834. There were many minute circumstances related by the witnesses, showing why it was that the contents of the deed were so impressed on their memories; all of them need not be noticed. Most of the witnesses who had seen it w'ere officers, at that or some other period, of the corporation ; they were old native citizens of the place, men of intelligence, and whose veracity there was no effort to impeach. There is one circumstance, among others, well calculated to fix tiie fact of the deed and its contents on the memory: the- application of the political chief for a copy — the reason for such application being assigned by him, that as applications would he made to him for land under the colonization law of the State, lie wished precise information as to tiie boundaries of the corporation lauds. Tiie. alcalde swears that the copy was furnished, as requested by the secretary of the corporation, under tiis order. It was found in tiie public itrehives of the ayuntamiento, where of right it belonged, with papers relating to tilings that occurred near to its own date. We learn from history that the first, settlement of the town was made in 1717 or 1718. This was tiie time of the settlement of the Canary families, and the deed bore date within twelve or fourteen years after tiie same time. It is deeply to be regretted that those venerable archives could not have been preserved and protected, alike from ignorant', .wanton vandalism, and the marauding speculator. Tiie loss from these sources of destruction to the early history of our State will never be fullv appreciated. The fragments left serve only to admonish ns that it lias been great and irreparable. It would have been well had the Government of Texas taken early and effective means to preserve not only the public archives of that venerable mother city, but also the abandoned papers of the extinguished missions. But in the midst of the excitement of a revolution such things are not apt to be thought of as they should be.
After such an array of testimony of the most unimpeachable character, it would be vain and useless to urge that the former existence of the deed and its contents liad not been proven most fully and satisfactorily.
The evidence of James, the surveyor, fully establishes the metes and bounds as called for by the proof of the contents of the lost deeds. Most of them were well known and notorious marks or monuments. And he testifies that there was no conflict or discrepancy in the opinions of the witnesses who *151 •pointed out the landmarks, excepting at one point; that was as to the locality ■of the Jacolitas, which was afterwards fully concurred in by the witnesses, on •a re-examination of the locality. These localities were all pointed out and" ■sworn to as the landmarks of the exidos, or lands pertaining to the corporation, by very old, intelligent, and respectable native citizens of San Antonio. •Some of them testified tliat these landmarks had been pointed out to them by very old men, who are dead long ago, as the boundaries of the town tract, and That they had never heard these boundaries questioned until within the last few years. Some of these boundaries or landmarks were of such a character ■that' their appearance would most naturally have suggested their object and prevented any misconception as to their intent and meaning. Such is the ■stone mound at the head of the San Antonio river, raised by stone and mortar, the stone mound around the live oak tree, and the Jacolitas. Some of the witnesses who had never traced the boundaries, and had not seen the landmarks, testified that they liad always understood that the town exidos extended from •tile Cíbolo on the east to the Leon on the west, and to the stone mound at the head of the San Antonio river. There was no attempt to impeach the credibility of any one of these witnesses, or to show that they had been mistaken. No witnesses were introduced to swear that they never had heard of t he.se land-imarks, or of the claim that such were boundaries of the exidos claimed by the •city. The absence of such proof shows clearly that the claim was notorious, .and generally understood by the whole community. One of the witnesses for ■the corporation, an old man, swears that when a young mail he wished to •obtain land, which was refused to him on the ground that the huid belonged to the corporation, and that three very old men were sent out with him, who •showed him the boundaries, and told him to remember what they told him, so that he might be able to show it to others. This would lie carrying back the ¡proof of these boundaries and of this claim of right to a very remote •period, and would present such a case as Lord Kenyon thought would justify <the presumption of one hundred grants, if necessary to sustain the right.
It was abundantly and clearly proven that the city authorities had, from 'time immemorial, exercised control and ownership over these lands, to the extent of the boundaries set up as the exidos of the city; tliat they had appointed .■a juezde campo, or Held judge, whose duty it was to see that the pecan trees were not out down by those who were gathering the nuts, aud to see that there was no destruction by fire ; and that tie liad authority to call out the inhabit-.auts of the city; that, under the direction of the city authorities, it had always been used for pasturage, quarrying stone, &c.; that when an application was •made to the political authorities for land within the bounds claimed, the city ¡authorities interposed and prevented the obtaining the land by the applicant; ■that they liad done so when Balmaoida applied for land north of the city.
This would seem to be such a use and occupation, coupled with the claim of right, as would raise a presumption of a deed, if none had ever really existed; or, in the language of Lord Kenyon, “that it would authorize the presumption of ■one hundred grants, if it were necessary to sustain such a right, so founded on the use and occupation,” quoted, with approbation, by Lord Ellenborough, "in Johnson v. Ireland. (11 East. R., 284.) In the ease of the Mayor of Kingston v. Horner, (1 Cowper R., 102,) Lord Mansfield, in discussing the questioij, -of the right to presume a grant, says :
“Now, with regard to admitting evidence to satisfy a jury that a charter •did exist within time of memory, which is not produced by record, my opinion ■is tliis, namely: that all evidence is according to the subject-matter to which "it is applied. There is a great difference between length of time that operates ¡as a bar; as, where the statute of limitations is pleaded as a bar to a debt, ¡though the jury is satisfied the debt is due and unpaid, it is still a bar. So in ¡the case of prescription; if it be time out of mind, a jury is hound to con- *152 elude the right from that prescription, if there could be a legal commence — , ment of the right. But any written evidence showing that there was a time when the prescription did not exist is an answer to a claim founded on prescription. But length of time, used merely byway of evidence, may be left to-the consideration of a jury, to be credited or not, aiid to draw their inference one way or the other according to circumstances. For instance, there is nO' statute of limitations that bars an action upon a bond; but there is a time when the jury may presume the debt tobe discharged, as, where no interest appears to have been paid for sixteen years. But if a witness is produced to prove the contrary, as by showing the party not to have been in circumstances to pay, or-a recent acknowledgment of the debt, the jury must say the contrary. If a foundation can be laid, that a record or deed existed and" was afterwards lost, it may be supplied by the next best evidence to be had ; or, if it cannot be shown that it ever existed, yet, enjoyment under a title which can only be by record, is strong evidence to be left to the jury that it did once exist. I do-not know an instance in which proof may not be supplied. These are general rules, and it would be mischievous if it were to be laid down that there can be-no presumption since the time of Bichard the First to confirm a title by charter.”
The above citation has been made from the opinion of Lord Mansfield,, because-it is believed to be a clear and satisfactory definition of evidence, and because he has based the doctrine of presumption from lapse of time on sound' legal principle, as contradistinguished from a bar interposed by the statute of' limitations or the law of prescription, the latter of which is absolutely rested on the supposition, that beyond the memory of man means beyond the reign of Bichard the First. If it were not for the salutary rule of presuming a deed from use and occupation, most valuable franchises and rights would be lost, as it would not often occur that they could be supported by the English rule of' prescription. Lord Mansfield, in the same opinion, says: “I have mj^-self taken it to be established in point of law, that though the record be not produced nor any proof adduced of its being lost, yet under circumstances it may be left to the consideration of a jury or á court of equity, if the case comes-propcrly before them, whether there is not sufficient ground to presume a. -charter.” In the case of Read v. Brookman, (6 English Ch. R., 82,) Mr. Justice-Buffer says : “For the last two hundred years it has been considered as clear law, that grants, letters patent, and records may be presumed from length of time. It is so laid down in Lord Colce’s time (12 Co. R., 5) as undoubted law at that time, and in modern times it has been adopted in its fullest extent.”' He refers to the case of Darwin v. Upton, in which it was held that twenty years’ quiet and uninterrupted possession of ancient lights was deemed a sufficient ground from which the jury might presume a grant. See, also, the King v. Newling, (6 Id., 168,) where the court refused to grant a quo warranto, on the ground tiiat the defendant had held the office twelve years. See, also, Johnson & Humphrey v. Ireland, (11 East, 280,) where it was ruled that the enfranchisement of a copyhold estate could be presumed against the crown. In the ease of Goodliltle, on the demise of Parker v. Baldwin, (11 East, 488,) the doctrine was recognized, that a possession of crown lauds for fifty-five years would authorize a presumption of a grant from the crown. But as the statute forbade all grants of the forest of Dean, of which ihe land in controversy was a part, the presumption could not arise, because that the statute forbade-the presumption of a valid grant. It seems to be well settled that the presumption will always arise, unless it appear that no valid grant could ever have-been made. It appears, therefore, to be well settled in the English courts that a grant will be presumed from lapse of time when it is to support a right in possession and long enjoyed; and the only qualification to the rule seems to-be, that it must not appear that a valid grant could not have been made.
We prepare now to examine the American doctrine on the subject.. *153 Professor Grcenleaf discusses this question, under the head of presumptive evidence, and ranges it under his subdivision of presumptions of law, which is again divided by him into two classes, namely..conclusive and disputable. lie says, “ conclusive.” are the rules determining the quantity of evidence requisite for the support of any particular averment which is not permitted to be overcome by any proof that the fact is otherwise; that they have been adopted by common consent, from motives of public policy, for the sake of greater certainty and the promotion of peace and quiet in the community, and therefore it is that all corroborating evidence is dispensed with and all opposing- evidence is-forbidden. (Chap. 4, secs. 14 and 15.) And in section 16, he adds: “Sometimes this common consent is expressly declared, through the medium of the Legislature, in statutes,” and, among other illustrations of his text, ho says: “So the possession of land for the length of time mentioned in the statutes of limitation, under a claim of absolute title and ownership, constitutes against all persons but the sovereign a conclusive presumption of a valid grant.” The-Professor continues, in section 17: “In other cases, the common consent by which this class of legal presumptions is established is declared through the-medium of the judicial tribunals, it being the common law of the land; both being alike respected, as authoritative declarations of an imperative rule of law, against the operation of which no averment or evidence is received. Thus, the uninterrupted enjoyment of an incorporeal hereditament for a period beyond the memory of man, is held to furnish a conclusive presumption of a prior grant of that which has been so enjoyed. This is termed a title by prescription. If this enjoyment has been not only not uninterrupted, but exclusive and adverse in its character, for the period of twenty years, this also lias been held at common law as a conclusive presumption of title. Títere is no-difference, in principle, whether the subject be a corporeal or an incorporeal hereditament. A grant of land may as well be presumed as a grant of a fishery, or a common, or a way.” And he adds: “The possession of land, however, for a shorter period, when coupled with other circumstances indicative of ownership, may justify a jury in finding a grant.” Again, in discussing presumptions of fact, in section 45, same chapter, it is laid down, that “though lapse of time does not of itself furnish a conclusive legal bar to the title of the sovereign, agreeably to the maxim, Nullum tem/pus occurrit regi, yet, if the adverse, claim could'have had a legal commencement, juries are instructed or advised to presume such commencement, after many years of uninterrupted adverse possession or enjoyment.” And he refers to the English authorities already noticed.
In t.lie case of Coolidge v. Learned, (8 Pick. R., 508,) Judge Wild, in discussing the origin of the rule of common law, by which it was fixed that legal’ memory went back to Bichard the First, which is fixed as the date of legal prescription, says, that “the limitation in question (if it can now be called a limitation) was first established soon after the statute of Westminster, 13 Ed. I. c. 39, and was founded on the equitable construction of that statute, which provided that no writ of right should be maintained except on a seizin from the time of Bichard the First. It was held that an undisturbed enjoyment of' an easement for a period of time to give title to land by possession was sufficient also to give title to the easement. (2 Roll. Abr., 269; 2 Inst., 238; Rex v. Hudson, 2 Str. R., 909; 2 Stark. Ev., 1205.) Upon this principle the time of legal memory was first limited; and upon the same principle, where the limitation of a writ of right was reduced by the statute of 32 Hen. VIII, eh. 2, to sixty years, a similar reduction should have been made in the limitation of' the time of legal memory. This was required not only by public policy, to quiet long-continued possessions, but by a regard to consistency, as it would have been only following up the principle upon which the first limitation was founded. And of this opinion was Rolle, (2 Boll. Abr., 269,) though he admits that at his time the practice was otherwise. Why the opinion of this-eminent judge, founded, as it was, on reasoning so solid and satisfactoiy, was *154 mot adopted by the courts, does not appear. But it does appear that the principle upon which his opinion was founded was respected and carried into ■operation in another form. For though the courts continued to adhere to the limitation before adopted, yet the long enjoyment of an easement was held to be a sufficient reason not only to authorize but to require the jury to presume .a grant. And it has long been settled that the undisturbed enjoyment of an incorporeal right, affecting the lands of another for twenty years, the possession being adverse, and unrebutted, imposes on the jury the duty to presume a .grant; and, in all such cases, juries are so instructed by tiie court-^-not, how■ever, because either the court or the jury believe the presumed grant to have been actually made, but because public policy and convenience require that long-continued possession should not be disturbed.
“The period of twenty years was adopted in analogy to the statute of limitations, by which an adverse possession of twenty years was to bar an action of •ejectment, and gave a possessory title to the land. Thus, it appears, that, although prescriptive rights commencing after the reign of Bichard the First are not sustained in England, yet a possession of twenty years only is sufficient to warrant tiie presumption of a grant, which is tlie foundatiou of tiie doctrine of prescription. In the one case, the grant is presumed by tiie court, •or is presumed bj’’ the law; and in the other, it is presumed by the jury, under the direction of the court. The presumption in the latter ease is, in theory, it •is true, a presumption of fact; but in practice, and for'all practicable purposes, it is a legal presumption, as it depends on pure legal rules; and, as Starlde remarks, ‘it seems to be very difficult to say why such presumptions should not at once have been established as mere presumptions of law, to be applied to tiie facts without the aid of a jury.’ ”
Tiie conclusion from tiie authorities referred to is, that, according to -tbe-common law of England, the possession of land uninterrupted and exclusive, with the exercise of ownership, for the term of twenty years, raises a presumption of a grant under which the possession must be supposed to have •commenced, unless there are circumstances that rebut such presumption, and ■show that there could not have been a grant sucii as was shown in the case of Goodlittle on the demise of Parker v. Baldwin, that the statute restrained the crown from granting the forest of Dean, which rebutted and forbade tiie presumption that tiie possession liad commenced under a grant; but for this prohibition a grant would have been presumed against tiie crown. That this is the common law, as understood in the several courts of the United States, •modifying the rule in some of them in analogy to their statutes of limitation, there can be no doubt. The common-law rules of evidence were introduced ■into our courts, by an act of Congress of the Republic, as early as 1836; and it in express terms introduces it as it was then understood and practiced. (Art. 125, Dig.) It must, therefore, govern this case and all others in our courts, •as it is very clear that, as to matters of evidence, the laws of the forum where •the suit is tried must prevail. It is laid down by Judge Story, “that tiie doctrine of the common law is so fully established on this point that it would be useless to do more than to state tiie universal principle which it lias promulgated ; that is to say, that in regard to the merits and rights involved in actions, ••the law of tiie place where they originated is to govern; but the forms of the remedies and the order of judicial proceedings are to be according to tiie law •of tiie place where the action is instituted, without any regard to the domicile ■of tiie parties, the origin of tiie right, or the country of tiie act.” (Conflict of Laws, chap. 14, sec. 558; Bank of the United States v. Donally, 8 Pet. R., 361, 373; sec, also, a note to sec. 557, Conflict of Laws, in which is given tiie very able opinion of Lord Brougham, in Donn v. Lippmaur, 5 Clark & Finnell, 1-14.) Whether tiie corporation owned tiie laud in controversy in this suit must depend upon tiie law of tiie place, and time when the right accrued; but in adjudicating on that right, and in enforcing tiie remedy, we can ac *155 knowledge no other law of evidence or rule of proceeding than those of our ■own forum.
In addition to the grounds we have been examining, the corporation relies ■on tlie second and eighth sections of the act of Congress passed 14th of December, 1837, incorporating the city of San Antonio, íis a legislative confirmation ■of the right to the land claimed. The second section of the act is as follows, i. e.: “That the bounds and limits of said city, and within which the said corporation shall exercise lawful jurisdiction, shall include and comprehend all that* tract of land originally granted to and composing said city, with its precincts.” And the eighth section is as follows, i. e.: “ That the said council, in ■conjunction with the justices of the County Court, are hereby empowered and authorized to sell and alienate such public lots or parcels of land as may lie within their jurisdiction, and to which there is no legal claimant or title; and also to dispose of such houses or other building as may have formerly been the property of the corporation of said city; and the council may sue for and recover all debts, forfeitures, &c., accruing or due to the said corporation, the proceeds of such sale to be appropriated to the erection or repairs of a courthouse, jail, and other such public edifices as may be deemed most fit, and to the erection and endowment of a public school.”
It is contended that the second section is a recognition of their original grant, and when connected with the long-continued possession and exercise of ■ownership, is conclusive against the Government, so far as it had any right to the land so recognized to be the property of the corporation; and, as this was anterior to the locations made by the appellants, it destroys all title to be derived from their locations. And, again: if it is not an absolute legislative grant to the corporation, the eighth section is such a designation and setting apart of the land as to destroy the right of location; that it had been set apart for a particular use. This, they suppose, would come within the principle decided at the present term, in the case of the State v. Delesdenier. It does seem to me that this action of the political authority givesrstreftgth to the •claim of the corporation. It is not to be supposed that the fact of the claim of •ownership of the land in question was unknown to the members composing the Legislature. And their action must have had reference to the land then in ■exclusive possession, with the exercise and notorious claim of ownership, by the corporation, and no adverse claimant, unless the Government set up a ■claim to it as a part of the public domain.
5? s S' ,b j¡ " ® — 'J? jo C!. SÍ * 3 = “ § 5 & t =.»; P 2 ® cc”1 ►- _ 2 CD r*. ^2 5 2 P **S p * 2.” | P g jo 'PS K* p 2. § V a | % o ‘x S £ S _ ■n p. O O ET g" : 2 p* •■5 >-1 CD (A 3 ‘ £ | §.. g;t3 s " o w -t *-» o „ tí ® P H* (fi pr, rn cn P g o pt o 2, & g -* o p; & p- „ tig 2 = 3 cn 8 ! g a* ~ !!• 3 a- § ’§ S' 3 S'^«3.g g=§ “ £, s a o o “ 3 o o'a & O " = ¿5 rt-s." fr as g.S'° ® " o'o : S*3 o £» Z S h.3 -5 m = o s o ^ ^ ° Ifí £ © E o 5 2 £ rp u «- s t ’«g x > 'ce © c*o z — 4 o '‘ W r* P g p>=■ tí a 2 o c a . g « s e " a'Ssi i* C+ o p. 5* o i Cj ^ >:§ ^ o g. ^ í — o ^ 2 g. ^ ^ ^ Cj o g Sí 55* g g. 5* < - p vs ; o - 2oS„ ^ o i'cí o g 2 g, CÓ CD mí . i ajj Til 5 «Ja ' m« Mi W o 3.J5 hS.2 3 ?. Ig g sAZ pjo 5^ 2 aS.u g-' f S? o ffS'S? o.ae'-1" 2 -SJoíjS P 8- p - " S § C» S* 2° P • — 1 c1;: o 2 s CD O á "! 2 1 cd j ir- ^ z ct* ''“ftP'S^á s* o• w3 ^ 3- £ “ « I S Si P 6^^ P S’ £-2^ p S ar^'o'm 5 * & ? ^ 3 p* j. 5 o ^ C. £ CTO A- s * ^ g g CD 2. o s 8 S g o a.aftfl z.á g P2 «3 c-f Crt CO P, ^ p. p. p sr o* ft 3 a 3 a ^ hb,? WÍjOOíi^-P- Q >-f <-! >T1 CD ^ —i ~® 8 o SB p S' p s-i.Vj ^ m ^ P 2. a 75 ct-o' ¿ o 7 ; ^, 2 - 5 3 < P? *-> o g - H- ~ 3 6 5 S í p S» c » 8 ;s tj3 s p a - *156 by prescription, is as follows, i. e.: “Tlie time in which things are prescribed is comprehended under the two kinds of prescription, immemorial and temporal ; the iirst is proved by witnesses of good fame or character, who depose to having seen the person in possession of the thing or property for forty years, and having' heard their ancestors say they never saw nor heard anything- to the contrary.” (White Recop., 1 vol., 95.) The first is a presumption of law, amounting-lo a positive rule, arising from the facts; the other, temporal, is-proved by the law itself, differing not materially from the principles of the common law as laid down by Professor Greenleaf.
It seems that prescription, from immemorial usage, according to the Spanish law, is fully made out by tlie facts in this ease.
"We propose now to examine the objections to tlie title of tlie corporation,, made by tlie appellants. In doing- so, we will proceed in the order presented in the appellants’ brief. It is objected that parol evidence of the grant ought not to have been permitted; that it was not the best evidence, tlie nature of tlie case disclosing better testimony. The objection is based on tlie hypothesis-that, from the nature of tlie case, better evidence did exist somewhere, and that the grant seen by the witnesses was wliat is called in tlie Spanish law a testimonio; and that tlie original or protocol was in tlie archives of the Government of Mexico, at the city of Mexico, or at Madrid, in Spain. If the deed itself had been present, it would not, on its face, according to the evidence in relation to it, have afforded any intrinsic evidence that there was better evidence anywhere, nor indicated the place where such better evidence could be found. If better evidence was in existence, it was shown by extrinsic proof of that fact, a knowledge of which was not brought home to the plaintiff's by tlie grant itself or any evidence that tlie fact was otherwise known to them. The evidence of Mr. Navarro alone creates tlie presumption that there was any better proof titan parol proof to be obtained anywhere; and1 his evidence is not to the fact, but is a deduction of law, as lie understood the law to bo. He says that lie lias seen au old Spanish title, made many, many years ago, for lands to tlie city of San Antonio, so late as tlie year 1833 or JS34; read the same; lias seen tlie field-notes in tlie same; tlie date of this title lie does not recollect, hut it was made by the Government of Spain; thinks it was by the vieeroyahy of Mexico, and was tlie foundation of San Antonio; never saw the title prior to tlie year 1833 or 1834; always heard and knew there was such a title; that Raymond Mosques and others found it; political chief ordered it to be copied, which was done; since which time, witness has not seen lite old title or the copy; witness saw tlie old title and the copy after it was made; this was publicly done, in tlie Municipal Hall of San Antonio, in presence of Domingo, Bustillo, and other old inhabitants of San Antonio; tlie title alluded to bad the absolute signs of being legitimate; it was found among tlie old archives, while hunting for it; it was a large folio, and written in large letters and plain Castilian; it was an absolute title or grant to the community of San Antonio, without reservation or control, but subject to the control and regulation of tlie ayuntamiento, so far as reserving lots for their own purposes and making of ditches; it was in the usual form of grants to other Mexican towns. On his cross-examination, he says: If the "title was issued by the viceroyalty of Mexico, the original title would be in the city of Mexico; the title seen in Sail Antonio was a testimonio, and believes it was, signed by tlie viceroy; thinks tlie original is in Mexico.
It was on the evidence of this witness, on his cross-examination, that the-appellants moved, in the court below, to exclude from tlie jury all the evidence of the grant, on the ground that better evidence could he procured. It will lie seen that the evidence is not positive as to tlie grant being from, tlie viceroy of Mexico, and that it is a conclusion of law by the witness; that if it was, tlie original would he in Mexico, because that he does not swear to (he fact of its being there.
*157 But, to put it on the strongest footing for the appellants, suppose that it was ¡proven that the original was' in Mexico, from which a copy could he obtained •by the interested party we will inquire what would be the effect of such proof, according to the rules of evidence as administered at common law; because it is by such rules we must be governed; it not being provided for by any statute ■of our State. Professor Greeuleaf, in his admirable work on evidence, in dis- ■ cussing the difference between primary and secondary evidence, says :
“Primary evidence is that which we have just mentioned as the best evi — • • deuce, or tiiat kind of proof which under any possible circumstances affords the greatest certainty of the fact in question; and it is illustrated by the case of a written document, — the instrument itself being always regarded as the primary or best possible evidence of its existence and contents. If the execution of an instrument is to be proved, the primary evidence is the testimony of the subscribing witness, if there be one. Until it is shown that the production ■of the primary evidence is out of the party’s power, no other proof of the fact is, in general, admitted. All evidence falling short of this in its degree is termed secondary. The question whether evidence is primary or secondary lias reference to the nature of the case in the abstract, and not to the peculiar ■circumstances under which the party in the particular cause on trial may be placed. It is a distinction of law, and not of fact, referring’ only to the quality sand not to the strength of the proof. Evidence which carries on its face no indication that better remains behind, is not secondary, but primary. And though all information must be traced to its source, if possible, yet, if there are several distinct sources of information of the same fact, it is not necessary, •ordinarily, to show that they had all been exhausted before secondary evidence can be resorted to.” (Greenl. Ev., sec. 84.)
The learned Professor, in a note to this section, discusses the question whether the law recognizes any degrees in the various kinds of evidence, and says the ■question lias not been fully settled. After showing the arguments in favor of the different degrees in secondary evidence, he continues : “ On the other nand, it is said that this argument for the extension of the rule confounds all distinction between the weight of evidence and its legal admissibility ; that the rule is founded upon the nature of the evidence offered, and not upon its strength or weakness; and to carry it to the length of establishing degrees in secondary evidence as fixed rules of law, would often tend to the subversion of .justice, and always would be productive of inconvenience.” He says that it is insisted that the rule of exclusion ought to be restricted to such evidence • only as upon its face discloses the existence of better proof; and where the ■evidence is not of this nature, it is to be received notwithstanding it may be shown from other sources that the party might have offered that which was ¡•more satisfactory; leaving the weight of evidence to be judged by the jury under all the circumstances of the case. He refers to the cases decided in England on this point, showing conclusively that the weight of adjudged cases :is opposed to acknowledging any degrees in secondary evidence, and he refers •to one ease so much in point that it merits insertion here. He says, that in the ■more recent case of Doe d. of Gilbert v. Ross, in the exchequer, where proper notice to produce an original document had been given without success, it was • held that the party giving the notice was not afterwards restricted as to the nature of the secondary evidence he would produce of the contents of the document; and therefore, having offered an attested copy of the deed in that ■ case, which was inadmissible in itself for want of a stamp, it was held that it was competent for him to abandon that mode of proof and to resort to parol testimony, there being no degrees in secondary evidence; for when once • the original is accounted for,' any secondary evidence whatever may be resorted to by the party seeking to use the same. (Doe v. Ross, 8 Dowl., 389 ; 7 M. & W., 102.) In the same note, he says that the American doctrine seems to be ■this: that, if from the nature of the case itself it is manifest that a more satis *158 factory kind of secondary evidence exists, the party will he required to produce-it; but that where the nature of the case does not itself disclose the existence-of such better evidence', the objection must not only prove its existence, but also must prove that it was known to the other party in season to have produced it on trial.
It seems from the above that the rules established by the English decisions, have been somewhat qualified by the American doctrine. It is very evident, however, jtiiat the English rule, as laid down in Doe v. Ross, has received the-impl íed ifnot the express preference of Professor Greculeaf. In the close of his work on evidence, he says : “Where the sources of primary evidence of a written instrument are exhausted, secondary evidence, as we have elsewhere shown, is admissible; but whether in this species of evidence any degrees are recognized as of binding force, is not perfectly agreed; but the better opinion seems-to be, that, generally speaking, there are none.” (Sec. 582, part 3, ch. 4.)
The most of the eases I have had an opportunity to examine, where any difference in the degrees or weight of secondary evidence was recognized, and where that which would be the most satisfactory was required, have been such-as, from the nature of the primary evidence that could not be obtained and from the laws of the land, (generally registration laws,) it was clear that a certified or proven copy could be procured; and I am much disposed to believe that the-modification of the English rule by the American courts may fairly bo attributed to the fact that the registration of instruments relating to property is more generally required in the American States than in England. But it is believed that the rule sanctioned by Greeuleaf is moro philosophical, and harmonizes better with the progress of tiie more enlightened jurisprudence of' the age on the subject of the admissibility of evidence; that is, to curtail and limit the objections to the competency, and let the evidence in, to go to the jury to judge of its weight or credibility. In every case where a party kept back a more satisfactory kind of evidence that was in his power to have produced and within Ids knowledge, it would operate strongly against such as he had offered, of less certainty, with the jury. This would prevent embarrassing discussions, that would often arise suddenly at the moment when testimony would be offered, whether it was the most satisfactory and carried the most weight of any that could bo offered. The only question should be, whether it was admissible and legal; the party offering it would take the risk of its being satisfactory, to prove the fact for which it was offered to the jury.
If, however, we adopt the more stringent rule supposed to prevail in the-American courts, it would not sustain the appellants in their objection to the-evidence offered of the lost grant. No witness swore to the existence of any public record of the lost deed, nor that the protocol, or original, did really exist anywhere. Nor was the witness positivo that it emanated from the Viceroy of Mexico. lie believed so, and that it was what is called a testimo-nio; and he believed the protocol, or original, was in the city of Mexico; not that lie liad ever seen it there, hut it was a conclusion drawn from — he does-not say what — but it is probable, from what he believed to he the law. There was nothing in the circumstances of the case from which the inference could he drawn tliat the plaintiffs knew of the existence of any evidence of the deed I hat would he more satisfactory proof than the parol testimony of the fact of its former existence and of its contents. It was a title, the witnesses say, founding the city and giving the land. It was to the archives of the town it properly belonged for safekeeping, and where it had been permitted to safely repose far a century. It was to these public archives that one would naturally look for this primary evidence of their rights. It was lost or destroyed, as it was proven. There was one place they were bound to look for it, and that was, in the public archives — it being a public and not a private .grant. It not being found there, I know of the existence of no law that would *159 have directed them to proceed to look anywhere else for it — to Madrid, Mexico, San Louis Potosi, or Monterey. To have brought the objection within tlie American rule, the objector should not only have proven that more satisfactory evidence did exist, but that the plaintiffs knew the fact in season to» have had it on the trial. "VVe believe that the evidence was properly received by the court.
If it had been rejected, however, it is not perceived how the appellants could* have been benefited by sucli rejection. The proof was ample and sufficient, according to the common-law rules of evidence, to have raised the presumption, of a non-existent grant.
The next objection presented by the appellants is to the competency of the witnesses, they being' corporators and citizens of the city of San Antonio.. This objection is not an open question, as it was decided by this court in Kemper v. The Corporation of Victoria (3 Tex. R., 135) that members of public corporations are competent witnesses for the corporation, with which decision we are fully satisfied.
The next objection, is that the contents of the deed were not sufficiently proven. There was not the slightest discrepancy in the testimony as to the contents of the grant, but a most remarkable coincidence and precision as to> the boundaries. They were not certain whether it was issued by the Government of Spain or the viceroy. This was of no consequence as to the contents. Most of the witnesses who testified as to its contents had an opportunity to examine it well; and they testified to circumstances well calculated to make them attend particularly to the contents of the grant. They believed that a fraud had been attempted on the rights of the city by their faithless delegate, Balmaeida. And Mr. Navarro, though he could not recollect the boundaries as described in the grant, corroborated the other witnesses, by testifying that the corporation had always exercised ownership over and claimed the land in question.
It is contended by the appellants that the action of the town council, in adopting, after a full investigation of the facts, the grant of two leagues made-by the Congress of Coahuila and Texas, is conclusive upon the town; and that, as there was no fraud, it would not be just to disturb patents. This objection is not sustained by the record. So far from showing that the town-council had adopted the two leagues, and had ordered it to be surveyed and placed upon the county map, the record shows that the mayor, not only without authority, but in violation of an express vote of the council, ordered the survey and the map, and that, too, under circumstances strongly indicating a fraudulent intent to promote his o wn private interest, as he immediately thereafter located on the land.
But had the record shown that the action of the town council was as alleged by the appellants, it could not have prejudiced the rights of the city, nor could it have given a right to the appellants, because the council had no authority to make such an adoption to the prejudice of the corporation, and the presumption would have been that it had been done in ignorance of their rights. In the case of New Orleans v. United States, (10 Pet. R., 734,) it was contended! that the official acts of the Federal Government, by legislation and otherwise,, respecting the common claimed by the city, and some of which were induced by the special application of the corporation, Afforded strong evidence, not only of the right of the United States to the property in question, but that such right was fully recognized by the corporation. Judge McLane, in answering this point, made by'the counsel for the United States, says: “It must be admitted that several of these acts are unequivocal in their character, and do-show, as contended by the attorney general, an admission on the part of the •city, not only that Congress had a right to legislate on this subject, but *160 :also to dispose of certain parts of the common in fee. And these acts, if unexplained, do strengthen the argument against the claim set hid by the city. It is a principle sanctioned as well by law as by the immutable principles of justice, that where an individual acts in ignorance of his rights, he shall not be prejudiced by such acts. And this rule applies at least with as much force to the acts of corporate bodies as to those of individuals.” After giving reasons, from which it might be inferred that the city was ignorant of her rights, he proceeded: “But, in addition to the consideration that the city authorities probably acted in ignorance of their rights, it may be safely assumed that they had not the power,'by the acts referred to, to divest the city of a vested interest in this common.”
It is said that it does appear that the Governors groa ted out-lots to settlers totally inconsistent with the right now set up by the city. The evidence shows that a few small lots had been granted to individuals, but does not clearly show by whom or on what occasion they were granted. In the case ■cited, of New Orleans v. United States, several similar grants were said to have been made by the Government, inconsistent with the right of che city. The court say: “From a careful examination of the jurisdiction exercised •over this common by the Governments of France and Spain, and the laws which regulated this description of property in both countries, the conclusion seems not authorized that it was considered as a part of the public domain, or •crown lands, which the King could sell and convey. This power was not -exercised by the King of France, and the exercise of the power by the Spanish Governor, in the instances stated, was in violation of the laws of Spain and equally against its usages. The land, having been dedicated to public use, was withdrawn from commerce, and so long as it continued to be thus used, could not become the property of any individual. So careful was the King of Spain to guard against the alienation of property which had been dedicated to public use, that in a law all such conveyances are declared to be null ■ancFvoid.” (10 Pet. R., 730.) The law cited in the above is in Novissima Recopilación, 1.1, b. 7, tit. 16. and is as follows, i. e“Our pleasure and will is to preserve their rights, rents, and property to our cities and places, and not to make any gift of anything oí them; wherefore we command that the gift or gifts we may make of them, or any part of them, to any person whatsoever, .are not valid.” That the King of Spain could, in right of eminent domain, ■appropriate parts of the corporation lands for public use, will not be contested; •and the mode of exercising- that power not being so well defined as it is under ■the Constitution of our State and the United States, it may sometimes have oeen abused, to the prejudice of individuals and corporations. But the presumption is that compensation was made; and no argument could be well founded upon sucli acts of usurpation, in favor of the abstract right in the King to convey the lands that had been granted to the town or otherwise set ■apart and dedicated to the public use. We do not find from the record a single instance in which such acts had been sanctioned by tile corporation. On the contrary, many instances are shown that, .on attempts being made by individuals to procure these lauds from the Government, they were defeated by the assertion of the right and title of the corporation. It is shown that the political chief of the department, acting under the colonization laws of Coa-huila and Texas, respected these lands, and considered them separate from the public domain, and not subject to be granted under the colonization law of the Republic. The few and inconsiderable interferences of the Government with the lands claimed by the corporation amount to nothing, when compared with such acts of interference by the Spanish Government and the United -States with the common of the city of New Orleans; and yet it was held by the Supreme Court of the United States that such acts did not and could not prejudice the rights of the city to the common.
The appellants coni end that the charge of the court contained in the second bill of exceptions was erroneous. It is, in substance, as follows, i. e.: 'That if the grant to the plaintiff was proved, and the same was inchoate and *161 imperfect, that the act of 1837 of the Republic of Texas, incorporating the city of San Antonio, attached to the said grant and rendered the same perfect, and conveyed the absolute fee to the city of San Antonio.
Note 4S. — Ilerndon v. Casiano, post, 322; Paul v. Perez, post, 33S; The State v. Purcell, 16 T., 310; Taylor v. Watkins. 20 T.. 638: Yancey v. Norris, 27 T., 10; Walker v. Hanks, 27 T„ 535; Bienoourt v. Parker, 27 T., 638; Forrest v. Woodall, S3 T., 363; Paschal v. Dangerfield, 37 T., 273; Turner v. Rogers, 38 T., 682.
Note 41). — MeGehee v. Dwyer, 22 T., 435.
The effect of this act has been before noticed; and it cannot be perceived that any well-grounded objection can be taken to the construction given by the court below; and it is believed to be perfectly correct. The charge was limited down to proof of the grant; if that was proven, then the act referred to approved and confirmed the title to the city.
But suppose the judge was mistaken in saying that it conveyed the fee to the corporation, and that it only conveyed the use. It was a dedication to such use, and was a setting apart and separating it from the rest of the public domain, and protected it from location; and a right to the use gave the plaintiff a right to sue.
It is contended that the court below erred in overruling the appellants’ objection to tho evidence taken by interrogatories on the part of the plaintiff, on tho grouud that it did not appear that legal notice had been given of the time and place of taking the depositions. It will be seen by a reference to the record, that the interrogatories were crossed by the appellants, and that the depositions were taken several terms before the trial came off, and no exceptions were taken until taken on the trial. There is believed, therefore, to be nothing in this exception.
It has been said that it is not reasonable to suppose the Government of Spain ever intended to grant so much land, by perfect title, to the corporation, and that a grant for more than four leagues is repugnant to the laws of the Indies. Tlie counsel have not directed our attention to the particular laws of the Indies restraining such grauts; and a reference to tho whole body of the common law or (o all the reported cases would have been just as profitable. The policy of the King of Spain was to have his towns and villages' founded with extensive exidos for pasturage and other purposes; and if he only granted or dedicated to tho use of the‘town, it would be such an appropriation, as wo have seen, as would have removed it from commerce and individual appropriation. It appears, too, that San Antonio would bo likely to receive most liberal and extensive privileges, as one of the witnesses testified that it was regarded as the mother city. We have examined every principle presented by llio. record, and our conclusion is, that there is uo error, and the decree must he affirmed.
Judgment affirmed.