## Thomas G. McGehee v. Mariana A. Dwyer, Ex'x, &c.

Although in a communication from the political chief to the grantee, a concession of land, in favor of the grantee, by the Governor, as copied in said communication, had not the signature of the Governor, the fact that such concession was recognized as genuine, and acted on by the political chief, to whom it was communicated by the Governor, is evidence of its genuineness.

The absence of the signature, in the copy of the concession, is no proof that it was wanting in the original. It was not unusual, in similar communications, by officials, of the order of their superiors, to give only the date and contents of the order, omitting the signature, as in this instance.

An objection to the title, as a circumstance of suspicion, that it was not included in the list of concessions or titles made by the government, furnished by Secretary Del Vallee, which purported to include only those, "the original "documents of which are on file in these archives, of which copies had been "furnished to the party," cannot be supported, where the evidence fully explains why the original of this concession was not on file in those archives, and consequently was not included in the list.

It is no objection to a title, extended by the commissioner of a colony, acting in that instance by virtue of a special authority to extend the title in question, that the land granted was without the limits of his colony: the authority conferred being independent of his office, as commissioner of the colony.

The commissioner derived his authority from the Governor, through the political chief, under whose immediate instruction he acted. It was the *duty* of the latter to judge of the genuineness and effect of the Governor's order; the commissioner had only to look to the instructions of the political chief, and carry them into effect; and it must be presumed that he obeyed those instructions, in executing the commission and extending the title, until the contrary appears.

If this court may judicially take notice of matters connected with the history of Milam's colony, an objection to the title, that the consent of the empresario was not obtained to the appropriation of the land within it, by the grant, could not have any weight; for, in fact, there was, at the time, no empresario to consent, nor whom it was necessary to consult.

The failure to obtain the consent of the empresario, did not invalidate the title. The additional article to the instructions to commissioners, of the 4th of September, 1827, requiring the consent of the empresario, was solely for the benefit of the latter; and Decree No. 314, (Laws and Decrees, p. '303,) annulled that article, and confirmed possessions that had been given, with or without the consent of the empresarios ; provided the express concession of the executive, and the other formalities provided by the laws, should have preceded.

It is no objection to an eleven league grant, that it was divided, and that titles issued to the land in several parcels. The legality of such dispositions of grants like the present, has received the repeated affirmative sanction of this court.

APPEAL from Guadalupe. Tried below before the Hon. Thomas J. Devine.

This was a suit instituted by Edward Dwyer, now deceased, and prosecuted after his death by the appellee, executrix of his will. The suit was brought against the appellant, in Hays county, and removed to Guadalupe county, on account of the disqualification of the district judge, presiding in Hays county.

It was an action of trespass to try title, for two thousand and fifteen acres of land, which the plaintiff claimed under a concession of eleven leagues, granted to Juan Martin de Veramendi, by the government of Coahuila and Texas. The land sued for was described by metes and bounds.

The defendant pleaded not guilty, and set up title in himself to the tract of land, or a part of the same, set out in plaintiff's petition, under a grant made to him, on the 19th day of February, 1835, by Talbot Chambers, as commissioner for Benjamin R. Milam's colony, for one league of land. The answer of the defendant alleged that the grant to Juan Martin de Veramendi, made by the government of the State of Coahuila and Texas, under which the plaintiff claimed, was null and void, because the concession to Veramendi, was never made or signed by the then governor of the said State of Coahuila and Texas, but the same was fabricated and forged; because the pretended report of the Ayuntamiento, of the municipality of Bexar, in favor of Veramendi's receiving a concession of said eleven leagues, was never in fact made by said Ayuntamiento, but that the same was fabricated and forged; because said governor never made any concession, or grant, to Veramendi, for the land claimed by plaintiff, nor did any such concession appear in the pretended title to said land, or for any other lands, but was a mere reference to, or recitation of, a purported concession for a certain eleven leagues of land, situated and described as being at a different and distant place, and specifically described as eleven leagues, in a square, on the Guadalupe and San Marcos rivers, at the junction of and between said rivers; which said eleven leagues, and no other, were specifically designated in said recited concession of the governor of Coahuila and Texas, as having been made in 1827, to the said Veramendi.

If Veramendi received a concession in 1827, defendant denied that he ever received any authority to change the location of said eleven leagues, or any part of them, from the place designated in the said concession; and averred that all the acts of the said Veramendi, or of the officers of the State of Coahuila and Texas, in surveying and making title to him, for the land here in question, were without authority, and void.

That said pretended concession or grant was null and void, because Jose Antonio Navarro, who represented himself, in making title, and putting the party (said Veramendi) in posses-

sion of said two leagues, had no authority to do so; and that he acted as such commissioner, without any commission, or legal authority, authorizing him to act as commissioner for that purpose. Other matters of objection were pleaded, not necessary to be stated.

It appeared, from the documentary evidence adduced by the plaintiff, and relied on as muniments of his title, that in the year 1823, Veramendi obtained a favorable report of the Ayuntamiento, on his application for a grant of five leagues of land; that said Veramendi, on the 22d of May, 1827, in a petition to the political chief, reciting the above fact, and referring to authenticated documents, purporting to be attached to the same, referred to the action of the several officers of government, had in relation to said grant, alleging that the alcalde, citizen Gaspar Flores, had, in 1824, "confirmed the donation" of said land, appointing the Cindico Procurador, citizen Jose Maria Escatera, to survey the land, and put him in possession of the five leagues, on vacant lands, but from the hostility of the Indians, and other causes named, this was not accomplished; and stated that he was now informed (at the date of the petition) that the land, which had been granted to him, was found within the colony of empresario De Witt; and prayed that, by virtue of the colonization laws of 24th March, 1825, the government would confirm that grant, without reducing him to the condition of a colonist of the empresario De Witt, within whose colony he supposed the land to be. He prayed also, for a grant of six more sitios; that the surveys should commence from the pass of the Birrey, on the eastern margin of the Guadalupe river, and (designating other boundaries to close the survey,) contain eleven leagues, in a square form. This petition being passed by the political chief to the Ayuntamiento, on the 31st day of May, 1827, they consented to the grant of the eleven sitios, as petitioned for, in the place designated.

Jose Antonio Navarro, a witness for the plaintiff, proved that about the month of July, 1827, he saw in the hands of Veramendi, a concession to him for eleven leagues of land; that

according to his best opinion and knowledge, it was a genuine concession, signed by the governor of the State.  He stated that, further than this fact, a series of documents and actions in conformity, manifest that Veramendi obtained said eleven leagues; and in the language of the witness, "so that as to me, "only in case I was to lose my mind, or promoted by an "infamous malice, could I deny this fact."  He stated that he had not the slightest doubt, that Mr. Veramendi obtained from the government of Coahuila and Texas, a concession of eleven leagues of land.  The witness stated that he meant, by saying that he saw the original concession of eleven leagues to Veramendi, that at the time the governor made the original title for the political chief, he sent also a similar one to Veramendi, as a courtesy, on account of the high standing of the party; that it was the copy, or original, sent by the governor to Veramendi, and signed by the governor, which he saw in the hands of Veramendi; knew it to be the genuine signature of the governor; stated that it was probable he had also seen the one to the political chief, but could not recollect.

Musquis, formerly secretary of the political chief, and afterwards himself political chief, proved the existence of the concession for eleven leagues of land.  Has seen the original concession.  Thinks he copied the petition and concession.

It was proven, that many of the original papers in the political chief's office, of Bexar, were lost or destroyed.  It was admitted by the defendant's counsel, that the original concession to Veramendi, of eleven leagues of land, did not exist in the clerk's office at Bexar, nor in the General Land Office at Austin; that after diligent search, it could not be found.

The plaintiff introduced as evidence, a communication from the political chief to Veramendi, as follows, to wit:

"On the 5th of July, of the former year of 1827, the most "excellent governor of the State communicated to this chief-"taincy the following:

"I have received, with your official order, No. 99, of the 9th "of the past, the petition included by the citizen Juan Martin

"de Beramendi, in which he solicits eleven sitios of land for "farming and stock raising, on lands demarked for 'the colony "of the empresario Green De Witt; and attending to your "information, and that of the Ayuntamiento of this city, I have "thought proper to accede to said petition, using of the powers "conceded to me by the law of colonization, for the eleven sitios "claimed by the party interested; and I declare that the first five "sitios that he solicited, since the year 1823, notwithstanding "they were conferred by the alcalde, and a commissioner ap- "pointed to see them with his eyes, and give possession, nor "the payment of their value according to the laws then in force, "the party interested is bound to pay the value of the eleven "sitios into the treasury of the State, according to the law of "colonization, and to subject himself, in its cultivation, to the "terms therein provided, without it being necessary to declare "that he is not subject to the conditions of a colonist, in regard "to the empresario not having solicited him to establish himself "in his colony. For the possession of the eleven sitios adjudi- "cated to the citizen Beramendi, you can commission a person "of your confidence, to perform the corresponding acts, and "that the surveys be made by a surveyor, with all exactitude, "for which purpose I return to you the aforesaid petition.

"And I transmit it to you for your intelligence, and to the "end that, with the aforesaid superior order, and your authen- "ticated petition which accompanies, you may apply to the "citizen Juan Antonio Padilla, commissioner-general, appointed "by the supreme government of the State, to grant possessions "of the lands that are conceded, to the effect that he may "verify the eleven sitios of land that have been conceded to "you, with the understanding that the document that he may "form, will be passed in the original to this chieftaincy, being "bound to give to you the necessary testimonial copies. Bexar, "17th of October, 1829. God and liberty.

"RAMON MUSQUIS.

"To the citizen Juan Martin de Beramendi."

On the 29th day of November, 1829, Veramendi petitioned for an exchange of six of the leagues granted him, to a more eligible situation, on account of the hostility of the Indians. On the sixth day of October, 1830, the exchange was granted. On the 2d day of June, 1831, he petitioned for the privilege of locating the said six leagues, on the lands which had belonged to the mission of Refugio, and had become vacant, and to be put in possession of them. The petition was granted, and an *amparo* issued, that he might be placed in possession, until a commissioner should be appointed to give him possession in form.

September 22d, 1831, Veramendi petitioned the executive of the State, that of the five remaining leagues, he might give him two by the heads of the spring of water, called the Comal; another on the spring of water called the Guadalupe; and the remaining two, on the heads of the San Marcos, splitting the surveys from the road on this side, by its head, until it touches the Blanco creek. The land in controversy is situated on the tract last named.

In conformity with the petition to the political chief, asking that a commissioner be appointed to make the documents, and give the corresponding possession of the said last named five sitios, on the 23d of September, 1831, Ramon Musquis, political chief, ordered Jose Antonio Navarro, "in character of commis-"sioner, specially appointed for the purpose by this chieftaincy, "in consequence of the authority that has been conferred on him "by the superior order of the 5th of July, 1827," to put said Veramendi, (vice governor,) in possession of the five sitios of land, last described.

Navarro, reciting his aforesaid authority as commissioner of De Witt's colony, and his special appointment aforesaid, "to extend the titles of possession, corresponding to five sitios "of land, that were secured by the vice governor of the State, "citizen Juan Martin de Veramendi, of eleven that were con-"ceded to him by the supreme government, as appears by the "official letter of concession, dated in Leona Vicario, on the "5th of July, 1827, and transcribed by said chief of depart-

"ment, on the 17th of October, 1829, which is attached to the "first original document of concession exhibited by the party "interested, in union with his petition that he presented to me "on the 5th of October (ultimo) last past," proceeded to put Veramendi in possession of the several parcels of land embraced in the five leagues heretofore described, and gave the corresponding certificates thereof; and on the 20th day of November, 1831, completed the title to the tract of two leagues on the San Marcos, by extending to him the title thereto, and putting him in possession thereof, according to a survey duly made. The title made by Navarro was dated at Gonzales.

It was proven by Jose Antonio Navarro, who issued those titles to Veramendi, that he transmitted to the political chief of the department, in San Antonio, the original title deeds, in the archives of which city they consequently were deposited.

This witness, in answer to the interrogatory, whether it was, or was not, the duty of the political chief to report or communicate to the governor and council of state, all the land titles, the originals of which were filed in his office, answered: "In "compliance with the tenth article of said instructions, the "commissioner for reporting lands, as well as the political "chief of the department, in obedience to the ninth article of "the decree, No. 13, advised the governor of all such proceed- "ings, invariably leaving deposited, in the archives of the "political chief, all original title deeds extended to private "citizens; likewise were deposited, in the archives of each "colony, all titles granted to colony empresarios."

The land on the San Marcos was without, and adjoining to, the colony of Green De Witt.

It was admitted that the title under which the plaintiff claimed, was of a date previous to the defendant's title, which was also introduced in evidence.

The district judge charged the jury, "that a certificate of the "secretary of State of Coahuila and Texas, 'that the list of "titles, (an exhibit marked B,) is a list of the leagues and labors, "which up to this date, (June 30th, 1832,) have been granted

"by the government to sundry private individuals, by way of "purchase, the original documents of which are on file in these "archives;' such list and certificate, may be evidence of such "titles being on file as stated, but are not evidence or proof, "that the concession, claimed under by plaintiff, was not "made in accordance with law, or not in existence at that "time.

"It is to be presumed that an officer, authorized by law to do "certain acts, has conformed to the law in the proceedings had "by him ; and a party alleging the contrary, must prove it.

"To support the charge of fraud, there must be such evidence, "either direct or circumstantial, given on the trial, as to justify "a jury in presuming it.

"If, from the evidence, you believe the concession or title to "Veramendi was made by the competent authority, you will "find a verdict for the plaintiff. The plaintiff must recover "on the strength of his own, and not upon the supposed weak-"ness of the defendant's title."

Among other charges asked to be given by the defendant, which were refused by the court, were the following :

"The existence of documents, communications, or decrees, "as a part of the title or grant of the plaintiff, would be a cir-"cumstance, from which the jury might infer that the grant "was ante dated, and fraudulent.

"If the jury believe, from the evidence, that the land in con-"troversy was situated out of the empresa of Green De Witt, "and within the jurisdiction of San Antonio, the commissioner "was not authorized to issue the title or grant to Veramendi."

Verdict and judgment for the plaintiff. Motion for a new trial by defendant, which was overruled.

The errors assigned, which were noticed by the court, were, the giving by the court of the instructions contained in the charge, and the refusal to give those asked by the defendant; also the overruling of the motion for new trial, the grounds of which were, that the verdict of the jury was contrary to evidence, and that the court mistook the law in charging the jury.

*I. A. Paschal*, for appellant. The plaintiff claims by virtue of a grant of two leagues, part of a special grant of eleven leagues, purporting to have been made to Juan Martin de Veramendi, Nov. 20th, 1831, by Jose Antonio Navarro, commissioner for delivering titles in De Witt's colony. The land was situated in Milam's colony, and the grant was dated and extended in the town of Gonzales, in De Witt's colony.

The defendant claims the land in dispute, that is within the conflict as shown by the survey, by virtue of a grant to him as a colonist of Milam's colony, extended by Talbot Chambers, in the town of Mina, February 19th, 1835. It is admitted that the transfer from Veramendi to plaintiff, is regular. There was a verdict for plaintiff below; a motion for new trial, overruled; and judgment in accordance with the verdict, from which the defendant prosecuted this appeal.

We think the verdict of the jury wrong, and a new trial should have been granted. The land was situated in Milam's colony, and therefore without the jurisdiction of the commissioner of De Witt's colony. The purported commission bore date anterior to Navarro's commission, and therefore could not have been addressed to him by the governor. The political chief had no power to extend the jurisdiction of Navarro, and authorize him to grant lands in another colony. A grant by a commissioner, without his jurisdiction, is null and void. (Mason v. Russell, 1 Tex. Rep. 721.)

Whatever may have been the opinion of the court, as to the correctness of the above proposition, it is certain that the grant of land in another colony, without the consent of the empresario, by a commissioner residing in a different colony, was a mere nullity. This Navarro seems to have understood, for he recites in the title, that the land asked for was not embraced in any empresa. The court historically knows the fact, that Milam's colonial grant bore date prior to Nov. 20th, 1831, the date of plaintiff's title. (Austin & Williams v. Houston.)

From the Spanish and English translation of documents, being proceedings in reference to the location of six leagues of

the Veramendi grant, it will appear, that the commissioner could not extend the title in any empresa, without consent of the empresario.  Col. Navarro himself, as curator of the minor heirs of Veramendi, in September, 1835, in a most eloquent and a very long appeal to the governor of the State of Coahuila and Texas, urged that a title should be extended to six leagues of land, on Mission river, in Refugio, in the colony of Power and Hewitson.  He stated a special order of the 6th of October, 1830, by the governor of the State, which permitted him to exchange six or seven leagues, from another location from that of the original location; that Veramendi, in 1831, had actually selected this very land; had populated, and had placed a thousand head of cattle on it; and had occupied it till his death.  The empresarios refused to consent to the grant; wherefore Vidaurri, the commissioner, refused to issue the grant. The appeal was made to the Supreme Government, and the decision of the empresarios and the commissioner was sustained. The title to the six leagues never was issued.  Then this very proceeding in the Veramendi title, and the decision of the highest authority in the State, show that a commissioner of a colony could not extend title to land, within his own jurisdiction, without consent of the empresario; much less could one have done so, residing in a different colony, who never saw the land, and to avoid the legal objection, recited it was in no empresa. The order which permitted the removal of six leagues of the original eleven, stated those six were to be located without prejudice to the rights of third parties.  The grant, then, in Milam's colony, was a mere nullity; certainly to the prejudice of Milam and his colonists.

The reason why the consent of the empresario, was required to every special grant within his colony, is obvious.  Had commissioners, outside of his colony, been permitted to make special grants within an empresa, without the knowledge or consent of the empresario, he never could have known what lands were vacant, nor could the colonists have known whether or not their lands had been granted by some distant commissioner. The truth

is, these settlement grants, such as Veramendi's, were small empresario grants, requiring settlement, cultivation and population, and could never be located within an empresa, without consent of the empresario. Every empresa was a land district within itself, having its own record of titles and maps. A grant made by a commissioner in De Witt's colony, of lands lying in Milam's colony, was not notice to a colonist, who subsequently acquired the land. McGehee was a purchaser in good faith; that is, he received title from the government as a colonist, in good faith, and without notice of the existence of the Veramendi title. He was not bound to look further than the report of the municipality of Mina, and of the empresario, that the land was vacant, unless it had conflicted with some title dated previous to Milam's colonial grant. There is no probability that this title of Veramendi was ever heard of in Milam's colony.

Another thing required by the colonization laws, and by the grant itself, was, that within one year from the date of the grant, permanent land marks should be erected at each corner by the settler. Now we do not say, that the failure to comply with this condition, would render the grant null; but we do say, that, if the party failed to erect the permanent monuments, or land marks, especially where he kept his title in his own pocket, and a part of the lands were granted away, without any knowledge of the first grant, the second grantee ought to take. Men cannot be expected to have an intuitive knowledge of what does not appear in its proper place, and equity will always favor him who has been injured by the laches or neglect of another.

The presumption is, that the title to Thomas McGehee was in accordance with law at the time. Even admitting that the title of Veramendi was regularly and properly granted at first—it was upon condition of payment of dues, and other conditions, for the non-performance of which the grant might have been declared vacant. To sustain the grant to McGehee, the court would presume the land was vacant, unless the plaintiff had actually proved the performance of conditions; as, to sustain a grant of an officer of competent authority, the court will pre-

McGehee v. Dwyer.

sume that was done, which might have been done, until the contrary appears. Therefore, if the Veramendi title might have been declared vacant, for the non-performance of the conditions, the court will presume it was so declared vacant.

Should the court believe either of these propositions to be law, that the grant to Veramendi was null, for the want of power in the commissioner to grant without the consent of the empresario; or, that it was null as to McGehee, for the want of notice to him, when he received his grant, it will not be necessary to examine the Veramendi title further, as such view would be conclusive of the case, at least to the extent of the confliction. We can hardly doubt but that the court will sustain the views here presented.

But should we be mistaken, it then becomes necessary to examine the plaintiff's title further, as he has no right to recover, without a valid subsisting title.

The title to the two leagues of land on the San Marcos, embracing the land in dispute, is exceedingly meagre, being made up of the recitation, by the commissioner, of copies and acts which do not appear in an authentic form. The defence seem to have been aware of this, and have incumbered the record with the whole title to the two leagues at the Comal springs, made on the tenth of the same month, as this is the first title issued to the eleven leagues, and in it, all the documents are recited at much greater length; and the attempt is, to show in the first grant, the power to extend the last.

This grant is voluminous, complex and difficult to comprehend, being made up of copies and documents of discrepant dates, and without regard to order. It was once before this court, and we suppose was never understood, as the court forbore to express an opinion upon its merits. The component parts of this title, which is relied upon to support the title to the land on the San Marcos, are as follows:

On the 5th of October, 1831, Veramendi presented his petition to the commissioner of De Witt's colony, dated at Bexar, stating, in substance, that on the 5th of January, 1827, the

supreme government conceded to him eleven sitios of land, upon the eastern margin of the Guadalupe river, upon the spring of water of San Geronomo, adjacent creeks, Almendrada and San Ysidro; that owing, first to the hostility of the Indians, afterwards the removal of Juan Antonio Padilla, the general commissioner, he had been prevented from taking possession of the land; that by a decree of 6th of October, 1830, the government permitted him to take six of the leagues in another place; that he himself had concluded to take, of the five remaining, two at the Comal, one at the Guadalupe, and two at the San Marcos; and concluded, by asking titles to these five, and stating the permission of the political chief to that effect.

On the first of November, 1831, at Gonzales, the commissioner ordered the titles to issue to the five leagues as asked, stating that he had been authorized so to do by the political chief, by commission of 23d of September; and that the land asked was vacant, and pertained to no empresa at Gonzales.

Next follows a petition of Veramendi, San Antonio, 22d May, 1827, addressed to the political chief, setting forth, that in the latter part of the year 1823, he had petitioned for five leagues of land; and that in 1824, they were conceded by the political chief and Ayuntamiento. The Indians having prevented his taking possession, he now asked that his petition be forwarded to the governor, praying a concession of these five leagues, and six more in De Witt's colony, on the eastern margin of the Guadalupe, in a square form, including the Ysidro, San Geronomo Spring, Almendrada, &c.

Next follows the reference of the petition to the Ayuntamiento, by the political chief, and their favorable report on the 23d and 31st of May, 1827.

Next in order follows a communication from Ramon Musquis, political chief, to Veramendi, dated Bexar, 17th of October, 1829, stating that on 5th of July, 1827, the governor had addressed to that chieftaincy a certain communication, which then follows. This communication was in answer to the political chief's official, No. 99, transmitting Veramendi's petition

for the eleven leagues of land, on lands marked for the colony of the empresario Green De Witt; also reciting that the governor had conceded the land, and directing the political chief to commission a person of his confidence to extend the title. The political chief then adds, that he transmitted it to Veramendi, that he might apply to Juan Antonio Padilla, the general commissioner, for title.

The concession, purporting here to come from the governor, does not purport to be signed by him.

Next follows a letter by Musquis to the the Ayuntamiento, dated 11th of October, 1831, setting forth a letter he had addressed to the governor the day before, making known their opposition to the grant of the two leagues on the Comal.

Next follows a communication from Musquis, the political chief, to the Ayuntamiento, making known the determination of the governor about the Comal land; and also that no evidence of the concession existed in Monclova. Musquis's letter is dated 29th November, 1831, and the governor's, 10th November, 1831. The latter is the date of the deed, the former is nineteen days later.

Next follows the commission from the political chief, dated September 23, 1831, to Antonio Navarro, authorizing him to extend the titles to the lands, merely reciting what Veramendi himself said as to the concession; but tells him that he will proceed in presence of the document of 5th July, 1827, which Veramendi *was bound to present to him.*

Next follows the title of possession, Nov. 10th, 1831, to the Comal leagues. The immediate title to the land in controversy, recited but few of these documents, and those imperfectly.

We will now proceed to show why the court erred, in refusing to instruct the jury as asked by defendant, in the 1st, 2d, 3d, 4th, 5th, 6th, 7th, 8th and 9th instructions.

The original concession was never presented to the commissioner, in an authentic form. Even the original communication of Musquis to Veramendi, in which he pretends to recite the concession, does not so present it, because the instrument, there

29

recited, does not contain the signature of the governor, and without this requisite, no instrument could have been valid.

Where the concession is recited, in the commission from the political chief to Navarro, it not only purports to have been received from Veramendi, the interested party, but the signature of the governor is again omitted. Musquis, the political chief, did not regard this as sufficient, and says to the commissioner, that he would deliver title to the land in the *presence* of the concession, which Veramendi was bound to *present to him*. This does not appear to have been done; on the contrary, the only evidence of the concession, is that taken from the statement of the vice governor himself.

The title purports to have been executed, and delivered to the interested party, on the 10th day of November, 1831, in Gonzales, to the two leagues on the Comal. On the *same day*, governor Letona dispatches a note to the political chief of Bexar, saying he had received the protest of the city against granting these lands, and asking that a certified copy of Veramendi's concession be forwarded to Monclova, as there existed no evidence of such a concession at that place. This note of the 10th November, and the political chief's communication to the Ayuntamiento, of the 29th of the same month, constitute and form a part of the grant. How this could have happened, unless the grant were ante dated, it is impossible to imagine. The original of the same dispatch was also read in evidence by the plaintiff. This shows that no evidence of the concession to Veramendi, existed in Monclova, on the 10th November, 1831. It is evidence furnished by the plaintiff.

There exists, in the land office, among its archives and records, an official document, showing *every concession* of land made under the colonization law, to settlers or purchasers, up to 1834. The defendant read a certified copy of this document, in evidence, and which will be found from page 95 to 108 of the record. Veramendi's concession nowhere appears, although it appears to have been made up of semi-annual official reports from the secretary of state to the political chief. By this, only

one concession appears to have been granted in 1827, and that a renewed title. This document is valuable, because it protects us against spurious concessions; as every concession recited in any grant, if genuine, will be found here included. It is true, such a genuine concession might be incorporated in a fraudulent title of possession. Then, it is certain, Veramendi's concession was not reported; and the official report, at least, raised the presumption that it never existed.

Again, in the record, will be found the proceedings in relation to the location of six of Veramendi's leagues, in Refugio. These proceedings took place in 1835, and the privilege of changing the six leagues, from their original location on the Geronomo, in De Witt's colony, was claimed by virtue of Musquis's order of the 6th October, 1830. Navarro, the commissioner, was the active party in these proceedings, and never said one word as to the grants on the Comal and San Marcos, but spoke of the original grant, as being between the Guadalupe and the San Marcos. He, at the time, represented the heirs of Veramendi, and his declarations and admissions are theirs. In this proceeding, he eloquently defended the concession, against the direct charge of Power and Hewitson, that none such existed. As these were furnished officially, with a list of all the concessions that issued, they knew there was no such concession. In these proceedings, Navarro nowhere pretends that the party, or any other person, had a right to change the land from its original location, unless authorized by the granting power.

When Navarro stated, on the stand, he had never heard the concession of Veramendi doubted, till of late years, he had forgotten the necessity he was under to defend it against the charge of Power and Hewitson, in 1835.

Again, when examined on the stand, by defendant, on being shown document No. 8, Letona's letter, he said he could not say whether he acted by virtue of that, or not; that it was no concession; that if it were included in the grant, he acted by it; if it was not, he did not. This document was included in the

grant, and is no concession. So far from being a concession, it says there was no evidence of such concession at Monclova.

Again, the proof of Navarro and Musquis show that, after the removal of Padilla, alcaldes were authorized to act as commissioners, where the land was out of an empresa. If the action were by virtue of the purported original concession, whether made by an alcalde, or by a special commissioner, it must have conformed to the concession, and have granted the land where the governor had granted it,—on the eastern margin of the Guadalupe, including San Geronomo Spring, Ysidro, Almendrada, &c.

The fact must not be lost sight of, that in a grant of eleven leagues, a grantee was only entitled to a particular quantity of arable land, and the balance in pasture land. And another fact, that in all settler's grants, settlement and cultivation were required. In the spirit and meaning of the law, it was not in the power of any man to settle and cultivate three or more places at the same time, remote from each other. And that, by thus dividing his land, instead of carrying out the object of the law, he would retard the settlement and cultivation, by appropriating to his own use all the best springs and spots.

*W. E. Jones*, for appellee. The appellee claimed the land in controversy, under an eleven league concession to Juan Martin de Veramendi; and the only question for the decision of the court, is the validity of the grant to Veramendi.

The appellant objected to the title of the plaintiff, on the following grounds:

1st. That it was a forgery. 2d. That it was fraudulently obtained. 3d. That no concession had ever issued, or appears in the title. 4th. That the commissioner who executed the deed, acted without authority, he being the commissioner of De Witt's colony, and the land lying without said colony. 5th. That the concession, being for eleven leagues, could not be subdivided.

The first two grounds were conclusively settled by the ver-

dict of the jury, found upon a mass of testimony, which it is not deemed necessary to recapitulate. The last ground was also settled, by the decisions of this court, in Jenkins v. Chambers, 9 Tex. Rep. 167, and Hancock v. McKinney, 7 Id. 384. The testimony of Navarro and Musquis, clearly showed that it had always been the custom, acquiesced in, to subdivide concessions; but if it could have been made a question, in any case, it could not be in this, because on the 6th of October, 1830, the governor, on the petition of Veramendi, authorized him to subdivide his concession, and change the location. The original petition, and order of the governor, were exhibited and proven before the jury, and copied in the record.

The third objection requires a more extended notice. That a concession did issue to Veramendi, for eleven leagues of land, admits of no doubt; it is established, not only by the documents accompanying the titles, but by the evidence of Navarro and Musquis, the latter of whom testified that he transcribed it himself. That the original concession does not appear in the title, and was not in the hands of the commissioner, at the time he extended the title, is really the only question of any difficulty, presented by the third objection of appellant. A transcript of the concession, under the hand of the political chief, does appear in the title,—no doubt the very copy to which Musquis refers in his testimony.

Navarro testified most clearly, that the first governors of Coahuila and Texas, adopted three modes or forms of issuing concessions. The first mode or form was this: When a petition was presented, accompanied by the proper representations, if the governor thought fit to grant it, the original petition was returned to the political chief, accompanied by an official letter addressed to that officer, containing the concession. The official letter, or order, or decree, or by whatever name it may be designated, was archived in the office of the chieftaincy; a copy or transcript of it, under the hand of the political chief, was then handed to the interested party, together with his original petition, &c., and then became, in the hands of the commis-

sioner, full authority to execute the title. It sometimes, happened that the governor embraced two concessions, to different persons, in the same order. The original remained in the office of the political chief. And this is verified and exemplified by the case of Jose Maria Salinus, mentioned in the testimony of Navarro, who procured at different times, two certified copies of the concession to him.

The second mode or form used by the governors, was to write the concession on the petition, or attach it to it, and then return the original to the petitioner.

The third form was that which finally was used exclusively, of filing the original papers in the office of the secretary of state, certified copies of which were delivered to the petitioner.

Under the Spanish and Mexican laws, the powers conferred on officers, are usually expressed in general terms, and the officer is left to fix the forms, and particular modes of carrying into execution, the general powers conferred. In the colonization law, the authority given to the governor to grant concessions, above one league, is expressed in general language. "It shall appertain to the governor," says the law, "to increase the portions," &c. Whatever form the executive may have used, in issuing the concession, and in so directing it that the petitioner could avail himself of it; whatever practices, in this respect, were adopted and used; they became as much a part of the law of the land, as the authority itself to grant the concession. It matters not, whether a certified copy, from the secretary of state; or the original concession, signed by the governor; or a transcript, under the hand of the political chief, appears in the title: if all these forms were used, they all became the law of the land, for the benefit of the citizens, to make good their titles. The forms, precedents, practices, and usages of the public functionaries of that period, in executing and carrying out powers clearly granted to them, when established to the satisfaction of the tribunals of the present period, become the law for their guidance. We are bound to accept and receive, at present, as a valid title to land, any title which, so far as its

mere form is concerned, would have been a good title, under the jurisprudence of Mexico.

The testimony of Musquis, although the question was not addressed to him, incidentally confirmed that of Navarro, for he says that the concession to Veramendi, was issued in a form different from that of subsequent years; and he also says, that he copied it himself, while acting as political chief; the irresistible inference from which is, that the original was in the office of the chieftaincy, at the time he made the copy.

It is conceived to be too late now, to question the validity of a title executed in that form.

The last objection to the title, is, that the commissioner who extended it, had no legal authority to extend a title, out of De Witt's colony.

Navarro, who acted as commissioner, was specially designated by the political chief to extend the title, he being at the time commissioner of De Witt's colony, and the land lying immediately without and adjoining that colony.

A strong argument is deducible from the acts of the parties themselves, in favor of the legality of the act of the political chief. Veramendi, who at the time of receiving the title, was vice governor of the State, and must be supposed to have known the law, when he desired to have the title extended to him, applied to the political chief, to appoint or designate a commissioner for that purpose. He could quite easily have applied to the governor, and, without doubt, obtained his request. He was interested in having a good title; and it is irrational to suppose that he would apply to the political chief, unless the law, and usages of the time, pointed to that officer, as competent to comply with his request.

Musquis, who was then political chief, entertained no doubt of his authority; and Navarro received, and acted upon the authority of the political chief, without hesitation. These men could have had no sort of motive to do wrong, to do an illegal act; and being among the most eminent and learned in the law, of all the men of that day, with whose official character we are

acquainted, a presumption of the highest and strongest kind is raised, that such was the known and recognized law of that period.

The governor could appoint any person to act as commissioner, or designate a class of officers, any of whom could act; and as the political chief was the organ of the governor, and bound to obey him in every particular, there can be scarcely a doubt, that the political chief acted, in this respect, in obedience to the governor's orders. The order and decrees of the governor, could be communicated to that officer in simple official dispatches, never promulgated, and lost from the archives during the war. The legal presumption is, that the political chief, in assuming and exercising the authority of designating commissioners to execute special grants, acted in obedience to the order and decree of the governor.

Navarro and Musquis both testified fully to the authority of the political chief, to designate a commissioner to execute special titles. The latter, especially, declared that the political chief unquestionably had that power, and could either order an alcalde, or the commissioner of an adjacent colony, to extend such titles. It will be borne in mind, that Veramendi's concession issued in 1827, and the title was extended in 1831. No commissioner was named by the governor, Padilla being the commissioner general. The land applied for by Veramendi, in 1831, (the land in controversy) being in the extinct colony of Milam, and not within the limits or jurisdiction of the alcalde of the municipality of Bexar, it required the act of some officer to designate a commissioner to extend the title to it. Musquis testified that, at that period, the jurisdiction of the municipality simply extended to the settlements around San Antonio, and had no definite boundaries. Under these circumstances, he said, it was within the scope of his authority to direct an alcalde, or the commissioner of the adjacent colony, to extend the title. And in doing so, he no doubt acted in obedience to the order of the executive. The language of his answer implies as much.

It is made a ground of objection to the title, that two documents embraced in it—one an extract of a letter from the political chief to the governor, and the other an extract from the reply of the governor, and both addressed to the Ayuntamiento—bear date after the execution of the title, by Navarro, at Gonzales, and that the title must therefore be ante dated, and fraudulent.

These two papers are no part of the title, and have no necessary connection with it. Their appearance in the title is easily accounted for. It will be remembered, that a Spanish title is made up. of all the various original documents, which were issued by the various officers, the original petition, act of the political chief, action of the Ayuntamiento, concession of the governor, and the various orders of the commissioner done, to the final title. These various papers are stitched and bound together, and form the archive. It is easy to perceive that, before the archive, or the original, was returned to the political chief, these documents were forwarded to the commissioner for his information; and when the title was bound together, they were included in it, not as a part of the title, but simply as documents relating and auxiliary to it. At all events, it could only be a badge of fraud; and fraud is negatived by the verdict of the jury.

*H. P. Brewster*, for appellee. The questions before the court below, to be determined, related to the validity of a grant made to Juan Martin de Veramendi, from whom the plaintiff below deraigns title, which was attacked by the appellants, and the following objections made thereto in their pleadings:

1st. That the grant to Veramendi was a forgery.

2d. That there never was a concession made to Veramendi by the governor of Coahuila and Texas.

3d. That Navarro had no authority to execute the final title, or act of possession, to Veramendi; and,

4th. That it was unlawful to divide the grant, and make selections in several places.

The first objection is, to all intents, disposed of by the verdict in the case; and the evidence will be found to support the verdict, and in fact renders any other impossible; for there was no evidence, upon the trial, to raise such a presumption, far less to establish the fact. On the contrary, every fact disclosed by the record, tends to establish its genuineness, and to exclude even a reasonable doubt on the subject. A verdict, rendered under such circumstances, will be taken by this court as conclusive, upon the point determined by it. (Simms v. Price, Dallam, 618; Briscoe v. Bronaugh, 1 Tex. Rep. 326; Perry v. Robinson, 2 Id. 490.)

The fourth objection, as to the division of the grant, has been made in several cases, which have been before this court. In Hancock v. McKinney, 7 Tex. Rep. 384; the point was made, and pressed with earnestness, by appellant's counsel; and as it was not noticed in the opinion of the court, we are authorized to regard it, in the language of that opinion, as one of the "other questions of minor importance, raised in the progress "of the trial; but which are not regarded as presenting any "question of sufficient difficulty or importance, to require a par- "ticular consideration at this time." After this decision, will this court incline to review it, or re-investigate the question?

The evidence contained in the record is clear upon the point. Navarro and Musquis both said that it was frequently done, and that no objection was ever made to it. In the absence of any law, custom, or proof, to the contrary, this must be taken as conclusive. In Jenkins v. Chambers, 9 Tex. Rep. 167, the cases of The United States v. Clarke, 16 Pet. Rep. 228, and The United States v. Sibbald, 10 Id. 313, are cited, and we assume that the principle of that case is adopted.

There remain, then, before this court, for its examination and decision, only two points, the second and third, to wit: That no concession was ever made to Veramendi; and that Navarro had no authority to execute the title to him.

The original concession was not produced on the trial. Proof was made that it is not in the places, within the State, where,

if in existence, it should be found; and this we assume to be a sufficient predicate for the introduction of evidence of its existence and contents.

To establish the existence and regularity of the grant to Veramendi, we are not forced to rely on parol testimony only. A variety of solemn, authentic acts, in regular form, and duly proven, by public functionaries and official bodies, in the archives of the country, prove such a concession to have existed, emanating from and directed to the proper authority. It is recited essentially in the order of the political chief; it is recognized by the Ayuntamiento of Bexar, and by the State authorities at the capital; and most distinctly and satisfactorily proven, by the witnesses, Musquis and Navarro, both men of high character and position, as the history of the times shows, and possessing rare opportunities for information, both in reference to the grant itself, and to the forms, solemnities, and laws to be observed in making it.

The next, and only remaining question in the case, is as to the authority of Navarro to execute the title. It is in evidence, that Padilla was appointed a commissioner general, to extend titles in the province of Texas; and while in the actual exercise of his office, the title should have emanated from him; but it is further proved, both by Musquis and Navarro, and known from the history of the country, that he was arrested for some alleged crime, and suspended from his duties. It is not to be disputed, that the sovereign power, when it makes a grant, may and should provide all necessary means to secure to the party intended to be benefited, the enjoyment of what has been conferred upon him; and may, for reason, or for no reason at all, designate the channel through which the evidence of his right to possess and enjoy it, shall come. Our legislature might grant land to a citizen, and designate the secretary of the Senate, or the clerk of the House of Representatives, to make him his title in form; and although his title would differ from every other one in the State, it would nevertheless be good. The concession to Veramendi, recited in the notice from the

political chief, Musquis, says, "You can commission a person of your confidence, to perform the corresponding acts," &c. In obedience to this order, the political chief designated Navarro, who at the time was commissioner of De Witt's colony, to extend the title; which he did, not as commissioner of that colony, but as special commissioner for the occasion.

That this was the course provided by law, we may presume from the fact established on the trial, that such was the custom; and we may further insist on it, from the known fact, that in reference to lands, "extensive powers were conferred on the governor by the constitution and laws." (Hancock v. McKinney, 7 Tex. Rep. 384.) "He seems, at least, to have been "accustomed to perform acts, of the character of that which is "drawn in question; and those acts must have been entitled to "faith and credit at the time." In addition, we may assert, for this case, the application of the recognition and ratification, by the subsequent enactment, Article 16 of the law of the 28th of April, 1832. (Laws and Dec. Coah. & Texas, p. 191, Decree 190.) The extension of the title, in the manner shown in this case, contravenes no law known to the country at the time.

In the history of litigation, we venture to assert, in no case where secondary evidence had to be resorted to, has there been such clear and conclusive proof, by facts and circumstances, derived from authoritative sources. The existence of the concession, its scope and purpose, is shown by the communication from the political chief to Veramendi; by the opposition made by the Ayuntamiento of Bexar; by the reply of the governor thereto; and by the direct, full and positive testimony of Musquis and Navarro. The jury, to whom the cause was submitted, by finding generally for the plaintiff, have determined every issue in his favor, and thereby not only established the sufficiency of the evidence, but made it truth itself. In the case of Lewis v. San Antonio, 7 Tex. Rep. 288, this court held the title of the city good, although its existence was established by parol testimony only. The same was done in Herndon v. Casi-

ano, Id. 322 ; and in neither of these cases, was the proof so full and complete as in this.

WHEELER, CH. J. There does not appear to be the slightest foundation in the evidence, documentary or oral, for the supposition that the plaintiff's title was fraudulent, or a forgery. On the contrary, it bears upon it every mark of genuineness, and is supported by full and satisfactory evidence of its fairness, in every particular. The existence, genuineness, and loss of the original concession, is proved by ample evidence to that point. It is shown to have existed, and to have had public notoriety, by documentary evidence which is indisputable, as well as by the testimony of witnesses. (Lewis v. San Antonio, 7 Tex. Rep. 288.)

It is objected, that the concession, as copied in the communication of the political chief, is wanting the signature of the governor. But it is proved, that the original had his signature; and apart from the oral evidence, the fact that it was recognized as genuine, and acted on by the political chief, to whom it was communicated by the governor, is proof of its genuineness. That the political chief did not copy the signature in his communication, is no evidence that it was wanting to the original. Many instances might be shown of the communication, by officials, of the orders of their superiors, which give only the date and contents of the order, omitting the signature, as in this instance. Some of them may be found in Austin's pamphlet, addressed to his colonists, in 1829, republished by Mr. White, in his Collection, (1 White's Recopilacion, pp. 586, 597.) Such, I apprehend, was the general, if not the universal custom, in similar communications.

It is supposed to cast suspicion on the concession, that it is not found upon the list furnished by the secretary, Del Vallee, as certified from the General Land Office. But this does not purport to be a list of all the concessions, or titles, which had been made by the government; but only of those, "the original documents of which are on file in these archives," of which copies had been furnished to the party. Why the original of

this concession was not on file in those archives, and consequently not included in this list, is fully explained by the evidence.

It is no objection to the title extended by the commissioner, Navarro, that the land was without the limits of De Witt's colony. The commissioner did not act, in this instance, by virtue of his authority as commissioner of the colony, but by virtue of a special authority, delegated to him for this particular service; which was entirely independent of his office, as commissioner of the colony.

The commissioner derived his authority to act from the governor, through the political chief, under whose immediate instructions he acted; the latter had to judge of the genuineness and effect of the governor's order; and the commissioner had only to look to the instructions of the political chief, and carry them into effect; and it must be presumed that he obeyed those instructions, in executing the commission, and extending the title, until the contrary appears.

It is objected, that the consent of the empresario of Milam's colony, was not obtained to the appropriation, by the grant, of the lands within that colony. It is to be observed, that this was not one of the objections to the title pleaded in the court below. If it were not a matter of the public history of the country, that there was in fact no acting empresario of that colony, to give his consent, we might hold, in accordance with Norton v. Mitchell, 13 Tex. Rep. 47, that the objection first taken in this court, should not be entertained; for that, as the consent of the empresario was not required to be embodied in the title, had objection been made to it on this ground, the consent of the empresario might have been proved. But this would be presuming against the known fact, that the empresario of that colony never carried his contract into effect; that no commissioner ever acted in conjunction with the empresario, to extend titles to colonists within this colony; and that the commissioner, (Talbot Chambers,) who was appointed (in 1834,) long after the contract had expired, (in January, 1832,) in extending

titles, did not act in conjunction with the empresario, but with Williamson, his reputed agent; that, in fact, there was no acting empresario at the time, to consent, or whom it was necessary to consult.

But if we may not judicially take notice of these matters, connected with the history of that colony, and are to suppose that Milam was acting as empresario of the colony, at the time, the failure to obtain his consent would not invalidate the title. The additional article to the instructions to commissioners, of the 4th of September, 1827, requiring the consent of the empresario, was solely for the benefit of the latter. It was a matter between him and the grantee, with which the government had no other concern than to see that his rights, when he saw fit to assert them, were not prejudiced, by action to which he had not consented. But this question is put at rest by the decree, No. 314, (Laws and Decrees, p. 308,) which annuls the additional article to the instructions to commissioners, and declares, in its third article, that " no change shall be made in any " of the possessions, that should have been given with the con- "sent of the empresarios, or without it, provided that the express "concession of the executive, and the other formalities the laws "provide, shall have preceded." And the succeeding article provides, that if prejudice shall have resulted to the empresarios, by the previous distribution of the lands, their sole recourse shall be, to be compensated by other vacant lands, sufficient for the families for which they contracted. This is an express legislative affirmation of the validity of the grants there located, and removes all room to question their validity, on that ground.

The objection, that the grant was divided, and titles issued to the land in several parcels, is answered by the fact, that this was the customary mode of disposing of grants, by the officers entrusted by law with the disposition of lands, and not in contravention of any provision of law. There is no ground to question the legality of these dispositions of grants like the present, and they have received the repeated affirmative sanc-

tion of the decisions of this court. (Jenkins v. Chambers, 9 Tex. Rep. p. 231 ; Hancock v. McKinney, 7 Id. 384.)

We are of opinion, that there is no well founded objection to the validity of the plaintiff's title ; and that there is, therefore, no error in the judgment, and it is affirmed.

Judgment affirmed.