TACITUS CLAY V. NESTOR CLAY'S HEIRS.

1. Though the colonization laws of Coahuila and Texas prohibited colonists from selling their lands until the period of cultivation was complete, and though this prohibition continued until March 26, 1834, when it was repealed as to settlers who had received their titles, yet it was not such a prohibition as precluded equities arising against a vendor who sold in violation of it, on the one hand, and in favor of his vendee on the other, who, on the faith of the purchase and with his vendor's consent, went into possession and continued to occupy and improve the land until after the repeal of the prohibition. (Paschal's Digest, Articles 589, 687 and 743.)

2. A colonist of Coahuila and Texas received title to his headright league in 1831. Previously, in 1830, being then in possession of the land, he sold part of it for a cash consideration, to T. C., and gave him a bond for title. Subsequently, in 1833 or 1834, T. C., with the consent of the colonist, his vendor, went into possession and put permanent and valuable improvements on the land; and in 1835 his vendor died, having never repudiated his title bond, nor controverted the right of T. C. to the land. *Held*, that practically and legally the title bond of 1830 received from these facts a new date, as of the twenty-sixth of March, 1834, when the colonist could legally have made sale of the land; and it was not necessary that a new consideration should have passed from the vendee to the vendor, on or after the twenty-sixth of March, 1834, in order to entitle the vendee to the land as against the vendor or his heirs. (See the opinion for a review of the leading cases on this subject.)

3. Where a colonist of Coahuila and Texas had sold part of his headright while prohibited from so doing, and had delivered possession to his vendee, who, with the colonist's consent, continued to occupy and improve the land until after the repeal of the prohibition in 1834, it was error to instruct the jury, in a suit for the land between the vendee and the heirs of the vendor, that the sale was incapable of ratification after the prohibition was repealed. The government of Coahuila and Texas might have maintained that position, but not the vendor or his heirs.

4. This court does not hold that the repeal of a statute validates contracts made in violation of its provisions, and while it was in force ; but a material distinction is to be taken, in this connection, between our own laws upon the one hand, and Mexican decrees upon the other.

APPEAL from Washington. Tried below before the Hon. I. B. McFarland.

A former appeal of this veteran suit is reported in 26 Texas, page 24, and a correct though compendious statement of the material facts will there be found. That appeal was taken from a judgment rendered in 1853, in favor of the present appellant, by the District Court of Fayette county, to which the venue had been changed from the county of Washington, within which the land lay, and where the suit was commenced. When the case was remanded to Fayette District Court, under the judgment reported in 26 Texas, nothing further appears to have been done until the Spring term, 1868, when the venue was changed back to Washington. Subsequently, the defendant, Tacitus Clay, filed an amended answer, fully alleging his citizenship at the time of his purchase of the land in controversy from his brother Nestor ; and as evidence of his then *status* of citizenship, and that it was recognized by the public authorities, he filed translated copies of his petition as a colonist for a grant of land made in June, 1831, of its approval, with an order of survey, by the empresario, Stephen F. Austin, on the same day and year ;

and of a final title issued thereupon, on the twenty-fifth of March, 1835. This amended answer was obviously filed to countervail the allegations of the plaintiffs' amended petition, upon which the rulings on the former appeal turned. And on this question of citizenship a large amount of evidence was adduced by both parties; but as it is not discussed in the opinion now reported, there is no occasion to detail it here.

The cause came to trial in the Washington District Court, in February, 1871. The jury returned a verdict in favor of the plaintiffs for the land, and also for the rents from 1846 to 1871, amounting to $5,900, less the value of the defendant's improvements, estimated at $3000. There was judgment in accordance with the verdict, and a new trial asked and refused.

The opinion of the court indicates the errors treated of upon the present appeal.

*A. M. Jackson*, for the appellant.

*Sayles & Bassetts*, for the appellees.—We believe that the law of the case, under the pleadings and evidence, was correctly given by the court.

The sale from Nestor Clay to Tacitus Clay in 1830, being made before the issuance of the final title, was absolutely void; and any sale made prior to March, 1834, being within six (6) years from the date of the grant (March 28, 1831), was absolutely void, and could not be enforced, even where the purchaser went into possession and made valuable improvements. (Hunt v. Robinson, 1 Texas R., 748; Robbins' Heirs v. Robbins' Heirs, 3 Texas R., 496; Spillers v. Clapp, 3 Texas R., 498; Dismuke v. Griffin, 10 Texas R., 113; Clay v. Cook, 16 Texas R., 70; Atkinson v. Bell, 18 Texas R., 474; Williams v. Chandler, 25 Texas R., 4.)

In Hunt v. Robinson, 1 Texas R., 748, Hunt, on the fourteenth of December, 1832, in consideration of $165 cash, and of a tract of land that day conveyed to him by Robinson, sold to Robinson his headright league (the title to which had been extended on the twenty-third of February preceding), delivered possession of the land, and obligated himself to make title as soon as the law would permit him. And it was held, that an action by the heirs of Robinson against the heirs of Hunt for the specific performance of this contract could not be maintained.

In Robbins' Heirs v. Robbins' Heirs (3 Texas R., 496), George Robbins contracted with Nathaniel Robbins to select, locate and obtain title from the government to the league of land to which he was entitled as a colonist, for which services, and the money to be advanced in their performance, he agreed to convey to Nathaniel one-half of the league when the title was obtained. Nathaniel performed his part of the contract, and obtained title for George. In a suit for specific performance by the heirs of Nathaniel against the heirs of George, there was a verdict and judgment for the plaintiff, which on error was reversed by this court, and the suit dismissed.

In Spillers v. Clapp (3 Texas R., 498), upon a similar state of facts, a similar judgment was rendered.

In Dismuke v. Griffin, the heirs of Griffin brought trespass to try title against the heirs of Harris. The plaintiff claimed title under the following contract:

"I, William Harris, of the State of Coahuila and Texas, Atoscocita, do sell unto Washington R. Griffin all my right, title and claim to all improvements where I now live, for the full and just sum of six hundred dollars, and which settlement was made this March will be five years ago, December 13, 1830.

" Signed and acknowledged in the presence of James McGlaughlin and Thaddeus Waul.

"(Signed)                    WILLIAM HARRIS.  [SEAL]"

It was held that a general demurrer to the petition should have been sustained, the contract being void because contrary to law, it appearing that the six years had not elapsed from the issuance of the title. (Dismuke v. Griffin, 10 Texas R., 113.)

Clay v. Cook (16 Texas R., 70) was an action of trespass to try title, the petition alleging that the land in controversy was granted to Whittaker on the eighteenth of May, 1831, about which time another league was granted to one Givens, on both of which plaintiffs' intestate, at the request of the said Whitaker, paid all the fees of office and public dues, in consideration of which Whittaker agreed, as soon as the law would allow, to convey to plaintiffs' intestate the league granted to him, he having agreed with Givens to take one-half of his league.  On demurrer to the petition, there was judgment for the defendant.

In Atkinson v. Bell (18 Texas R., 479) it was held, that a sale made before the issuance of the final title, although accompanied by possession, was void, and that the rule that when a vendor has no title and sells, any title afterwards acquired by him will inure to the benefit of the purchaser, does not apply in cases where such sale was prohibited by law ; such favor shown to a purchaser at a prohibited sale would thwart and defeat the policy of the government.

In Williams v. Chandler (25 Texas R., 4), Cook received from the government a title to a league of land, dated on the fourth of April, 1831.  On the nineteenth of December, 1831, he executed his bond, obligating himself to convey to the plaintiff the lower half of the league in consideration of his having paid the dues, etc.

33—XXXV

The bond was executed in conformity with an agreement between the parties, entered into before the title was extended, and the dividing line was run between them at the time the original survey was made for Cook, in 1830, who subsequently pointed it out frequently as the dividing line between himself and the plaintiff. Cook cultivated from 1830 to 1837, but subsequent to the execution of his bond, made no improvement on the lower half of the league. In various deeds executed by himself and wife, conveying portions of the upper half of the league, the divisional line, as run when the original survey was made, was referred to and recognized as the dividing line between themselves and the plaintiff. In November, 1836, when giving directions for drawing his will, he stated that the lower half of the league belonged to the plaintiff, and was understood by the party who wrote the will as referring in it alone to the upper half of the league. The court held that the contract was illegal and conferred no title upon the plaintiff, and that it derived no support from the oft-repeated admissions of it. And the court remark, "There is no case in which the right of the purchaser under a contract like the present has been upheld, unless supported by possession and strong equities, independently of the contract."

There is but a single case in which a contract of this character has been sustained. In Burleson v. Burleson (11 Texas, 2), a similar remark is made, but the case was decided upon an agreement in writing made in May, 1834, after the repeal of the law forbidding the sale.

In Mills v. Alexander (21 Texas, 154), the case was reversed on the error in the charge of the court as to the effect of the abandonment of the country, and the court say, incidentally, that it was obligatory on the plaintiffs

to restore the price and place the defendants *in statu quo* before they could avail themselves of the illegality of the contract of their ancestor, to recover back the land he had sold in his lifetime.

In the case at bar, the plaintiff tendered the purchase money and interest. The consideration paid is stated as eighty dollars. The proof is that the defendant occupied the premises up to the commencement of this suit, and that the rents during that time were worth several thousand dollars. Under the charge of the court the value of the rents was computed only from the commencement of the suit; the defendant was allowed full compensation for his improvements—thus restoring the purchase money several times over, and paying the full value of the improvements, and placing the defendant *in statu quo*.

In Hunt v. Turner (9 Texas, 385), the plaintiffs sued to recover back a tract of land sold by their ancestor Hunt, to Robinson, under whom the defendant claimed. Hunt and Robinson exchanged lands, the former receiving six hundred and forty acres, and about one hundred and sixty dollars cash, and each took possession of the tract he had purchased. The plaintiffs remained upon the land so received in exchange by their ancestor Hunt, until 1850, when they sold it. It was held, rightly as we think, that having placed it out of their power to restore the land they had received, they were not entitled to recover that given in exchange, and that their sale of the land under the circumstances amounted to a virtual ratification of the contract of their ancestor. The decision in this case rested upon the familiar principle that where there is an exchange of lands, "a mutual grant of interests, the one in consideration of the other, if either party be evicted of those which were taken by him in exchange, through defect of the other's

title, he shall return back to the possession of his own, by virtue of the implied warranty contained in all exchanges." (1 Sharwood's Blackstone, Book 2, 322.) The heirs of Hunt, by the sale of the land received by their ancestor in exchange for that for the recovery of which the suit was brought, deprived themselves of the ability to restore it; the action against them was rebutted against the suit brought by them ; and as they could not return back, as they were bound to do, what they had received, they were prohibited from recovering that which was given in exchange. This case illustrates the meaning of the expression used by the court in Burleson v. Burleson, Clay v. Cook, and Williams v. Chandler, that the right of a purchaser under a contract prohibited by the law of the land, would not be upheld unless supported by possession and strong equities, independent of the contract. Nestor Clay, before his death, asserted that the land had been given to his brother Tacitus, in consideration of his promise to bring to Texas their mother and sisters ; that he had failed to do this, and that he should not have the land. Tacitus did not himself remove to Texas, as he had promised to do, but sent out an agent to occupy the land for him. If possession was given to this agent, it was undoubtedly with the expectation that Tacitus himself would soon follow, and by complying with his promise, entitle himself to the land. Although cognizant of the survey made by Brown in 1835, he expressed himself as dissatisfied with the lines run ; and although there was, for nearly two years before his death, no legal obstacle to his making a final title, he died without ever having made it. The paper relied on as evidence of title is a mere loose memorandum. It describes no land, it names no grantee, it is unaccompanied by any of the customary or legal formalities. There must have been some reason

for the failure to execute a formal title to the land after it was surveyed, and after the legal obstacles were removed; and a sufficient reason is disclosed in the repeated declarations of Nestor Clay, that his brother had failed to comply with the agreement he had made, and should never have the land.

The purchase money and interest was tendered into court. The defendant had possession of the land for twenty years. The rents were far more than a compensation for the money and interest. In calculating the rents, the jury, under the charge of the court, only computed them from the time of suit brought. They allowed the defendant the full value of improvements worn out in his own service. Where, then, are those "strong equities, independent of possession," which should uphold this contract, made in violation of law, and time and again repudiated by the plaintiffs' ancestor?

The second proposition contained in the charge of the court is, that no subsequent acknowledgment or recognition of the bond dated May 15, 1830, could give validity or binding force to it. There could not be a novation or renewal of a contract which was void because made in violation of express law.

In Williams v. Chandler (25 Texas R., 4), already cited, the court say, "that an illegal contract can derive no support from the oft-repeated admissions of it. These cannot impart to it validity. They can amount to no more than confirmatory proof of its existence, which was unnecessary and unavailing."

It is not denied but that the parties might have entered into a new contract for the sale of the land after the twenty-sixth day of March, 1834, provided such new contract was founded upon a new and independent consideration, and had no connection with the

original unlawful contract. But if the new contract was based upon the old unlawful one; if it required that as a support, then manifestly it would be tainted with the original illegality, and would consequently be equally void.

It is to be remembered that the civil law was in force at the date of the transactions, and so continued until after the death of Nestor Clay. To the civil law, therefore, must we look for the true interpretation of this contract, and the proper rule of decision. Under the civil law a new contract, based upon an old consideration, would be denominated a "novation." It will be observed that the appellant has offered no proof whatever of any new contract, based upon a new and independent consideration; nor, indeed, has he attempted to show a novation, except by implication and inference from other facts, which by no means necessarily imply it.

A novation is defined to be a substitution of a new debt for an old one; the old debt is extinguished by the new one contracted in its stead. For this reason a novation is included among the different modes in which obligations are extinguished. (1 Pot. Oblig., side page 546; 1 Dom. Civil Law, 231; 1 Saund. Laws of Coahuila and Texas, 168.)

There were three kinds of novations. 1. Without the intervention of new parties, which was called generally a novation. 2. By the substitution of a new debt for the old. 3. By the intervention of a new creditor, to which is superadded the "delegation." (1 Pot. Ob., 547, 879.)

The contract under consideration, if it belonged to either, must have belonged to the first class. Let us see, then, what was necessary to constitute a novation. First, there must have been two debts, the original

debt, and that substituted in its stead.   It necessarily
follows, that if the original contract did not amount to
a debt, or civil obligation, there could be no novation,
for one of the necessary elements would be wanting.
The original obligation must not be one which the law
repudiates and annuls, for this could be of no avail.
(1 Pot. Ob., 553, 554.)

Obligations were divided into three classes.   First,
natural and civil; second, civil merely; third, natural
merely.   Obligations natural and civil were such as
the debtor was bound in conscience to perform, and
which might also be judicially enforced.

A civil obligation (*vinculum juris*, a legal tie), might
be enforced legally; but if it was merely civil, it im
posed no obligation in point of conscience.

A merely natural obligation bound the obligor in
point of honor and conscience, but the law allowed no
action to compel its execution.   (1 Pot. Ob., 173, 174,
175.)

A contract forbidden by the law, did not rise to the
dignity of an obligation at all.   It could not be a
natural obligation, because it had no sanction in honor
or conscience.   It could not be a civil obligation, be-
cause the law did not allow an action to enforce it.
Such was the contract between Nestor and Tacitus
Clay, of May 15, 1830.   It was absolutely void, being
forbidden by positive law.   It was neither a natural
nor a civil obligation.   It could not, therefore, support
a novation.

Nor does it make any difference that the prohibition
had been repealed at the time of the supposed nova-
tion, or new contract.   If such new contract had been
made, it would necessarily have grown out of, and
been immediately connected with, the original illegal
contract, and tainted with its illegality.   No distinc-

tion is perceived between the case at bar and one in which the contract being void by the law of the place where executed, and subsequently novated by the substitution of other securities, and the novation sued on in a State where such a contract would be binding. (See Marshall v. Shelton, 16 Texas, 344.) That was an action upon a security substituted for an illegal contract. The original contract was void by the laws of Mississippi, where it was entered into, and the security was substituted in Texas, where the original contract would have been lawful. This court held that the plaintiff could not recover, and quote with approbation the language of the Supreme Court of Mississippi (Coulter v. Robertson, 14 Sm. & M., 18), where it is said: "It is settled that where an original contract is illegal, any subsequent contract which carries it into effect is also illegal, where the consideration of a contract is impeached for illegality; if the subject matter of the contract can be traced back to an original illegal contract, the subsequent security is void." And in the above case of Marshall v. Shelton, the court held the following language: "It is laid down, that where a contract grows immediately out of, and is connected with an illegal or immoral act; or if the contract be in any part only connected with the illegal consideration, and growing immediately out of it, though it be in fact a new contract, a court of justice will not lend its aid to enforce it." (16 Texas R., 360.)

The true rule seems to be, that whenever it becomes necessary to resort to the original contract to sustain the new one, both are equally void, and this rule prevails as well under the common law as under the civil. (Toler v. Armstrong, 11 Wheat., 298; 2 Harris, 18; 4 Peters, 410; 3 McLean, 212; 7 Smedes & M., 380; 8 do., 380; Smith v. Barton, 2 Long, 155; Orr v. Lucy, 2 Long, 231; Sto. Confl. Laws, 205; 3 Cranch, 242.)

But even if it were competent for the parties to have made a novation, or new contract, there is nothing in this case to show that they did so, and the remarks of the Court in Williams v. Chandler, already referred to (25 Texas R., 12), are equally applicable here: "Whether the charge of the court in this respect is correct or not, in the abstract, is immaterial, as the charge of the court is responsive to the pleadings, and there is no evidence even tending to prove a recognition or confirmation of the contract."

The possession was given to McCrocklin, Tacitus Clay's agent, in January, 1834. The prohibition against the sale was not repealed until March 26, 1834. (Clay v. Clay, 26 Texas R., 24.) The act of putting the party (or his agent), into possession in January, 1834, at a time when he was not permitted to sell, can, of course, have no greater force than would the execution of a deed, with all the formalities of law. The running off of the land in January, 1835, is, then, the only circumstance which tends to show a recognition of the sale; and that amounts to nothing when coupled with the dissatisfaction at the survey, expressed by Nestor Clay, and his repeated declarations that Tacitus had not complied with his contract, and should not have the land.

*A. M. Jackson*, for the appellant, in reply.—A short reply to the brief filed for the appellees is necessitated and justified by sundry errors of fact into which opposing counsel have fallen, and which, though separately of but little importance, yet, when taken together, tend strongly to present the case in a wrong light.

1. In their preliminary statement of the case, appellees' counsel rather ignore those pleadings of the appellant (defendant below) which allege and insist

upon the "equities arising from the acts of the parties;" but before they close they make the assertion "that the defendant sets up a purchase in 1830 and a purchase in 1834, and these alleged purchases, with the plea of limitations, are his only defenses."

Now, if the court will look to the amended answer, it will see that the appellant there set up those equities fully and clearly.

2. Appellees' counsel state that "there was no proof that this paper (the title bond) was ever delivered to the defendant, or that it was intended for his benefit."

But the court will see that the bond came from the possession of the appellant, and was filed and adduced in evidence by him. The witness Hill saw the bond. And the appellees' own witness, T. C. McCreary, saw it, while he was a ward of the appellant and living with him on the land in controversy.

3. And counsel proceed to say, "nor was there any proof that Nestor Clay was then living on the land in controversy"—not quite asserting, but strongly implying, that there is no evidence to identify the land in controversy with the land designated in the bond.

But the court will see that it is conceded all through the record, and even in the brief of the counsel themselves, that the land in controversy is a quarter of Nestor Clay's headright league, and the title bond shows that the quarter sold was the southeast quarter of the tract. Now, Hill testifies repeatedly that the land acquired by Tacitus Clay from Nestor Clay was part of the latter's headright, and that there was a title bond for it; and Brown's survey fixes it beyond all question.

4. Repeatedly in their brief the counsel assert that Nestor Clay "expressed dissatisfaction" at the survey made by Brown.

But the court will see that Brown himself is the only

witness who testifies as to how his survey was regarded by Nestor Clay, and he swears that Nestor Clay seemed to be satisfied with it. What Mrs. McCrocklin says about a dispute between Nestor and Tacitus Clay, relative to the lines and corners, has no relevancy to the survey made by Brown. She makes no allusion to the survey in that connection, and the context shows that any such dispute must have been before the survey was made. Nor is there in all the record any other evidence to show that Nestor Clay was, or ever expressed himself to be, "dissatisfied with the survey." His acquiescence in it until his death corroborates Brown's testimony to the contrary. And if Nestor Clay ever did, as the counsel argue, deny the appellant's right to the quarter league, why should he dispute about its lines or corners? Such a dispute was itself a recognition of the appellant's right to a quarter of a league, not a denial of it.

5. On pages fourteen and fifteen of their brief, the counsel imply an assertion that when possession of the land, as the appellant's land, was given to appellant's agent by Nestor Clay, the appellant "did not himself remove to Texas, but sent out an agent to occupy the land for him."

But the court will see from the testimony of that agent himself (McCrocklin), and of his wife, and of Hill and Holmes, that Tacitus Clay brought that agent and his wife, and his own wards and servants, all the family he had, besides other friends and adherents, to Texas, and was in Texas, at Brazoria, when he sent McCrocklin and his wife and Hill on in advance to occupy his land, remaining himself at Brazoria only long enough to forward the large supplies, then invaluable in the country, which he had also brought with him ; and after doing this, he did come on himself and occupy the land.

6.   On page thirteen, and again on page fifteen of
their brief, it is asserted by the counsel that the jury,
acting under the instructions of the court, computed
rents against the appellant only from the commence-
ment of this suit.

But the court will see that the suit was brought in
1851, and the verdict of the jury shows for itself that
the rents were computed ever since 1846.   And though,
as the counsel assert, they did make a pen and ink ten-
der to appellant of his purchase money and interest,
yet neither the jury nor the court below had the courtesy
to even recognize that poor apology for legal justice.
These matters are not referred to here because deemed
intrinsically important, but to vindicate the facts of the
case.

Recurring to the controlling features of this cause, it
will be seen that the effort of appellees' counsel is to
place this case in that class which stands upon an inhib-
ited contract alone—never acted on by the parties, nor
recognized after the inhibition was abrogated.   To repel
this effort, I refer the court with perfect confidence to
the testimony of Brown, McCrocklin and wife, Holmes
and Hill, comprised within the last thirty pages of the
statement of facts.   No unbiased mind can read and
consider it without a thorough conviction of the error
and injustice of the judgment below.

Conscious of the inevitable failure of their attempt to
so classify this case, opposing counsel are driven to two
different and most desperate resorts.   The first is an
endeavor to controvert the proposition that the title
bond could be ratified after the inhibition of sale was
removed by the decree of March 26, 1834.   On this
point I rest content upon every case in the Texas Re-
ports which treats at all of the subject.   The citations
from the reports of other States are futile, because they

present cases wanting in analogy, and in which the pub-
lic policy, or the prohibition condemnatory of the con-
tract, had not been abrogated or changed.   Counsel
need not have gone so far to find that kind of a case ;
Wills v. Abby, 27 Texas, 202, is a good example of it,
and this court sustains in it the distinction on which I
am now insisting.

The other resort of counsel is to a proposition for
which they vouchsafe no authority and as little logic,
viz., that no equities could arise out of any acts of the
parties done prior to the removal of the prohibition
against sale.   This gives a posthumous power to that pro-
hibition never claimed for it before.   In the numerous
reported cases hinging upon that prohibition, no such
*post mortem* potency is once ascribed to it.   On the con-
trary, in Hunt v. Turner (9 Texas, 385), the possession
and improvements, from which this court deduced the
equities, was had and were made while the prohibition
against the sale was still in full force.   So, also, in the
Burleson case (11 Texas, 2), Jacob Burleson, whose
heirs prevailed in this court on their equities, took pos-
session of and improved the land in 1832, while John
Burleson was prohibited from selling it to him ; and the
equities arising from the possession and improvements
were recognized and enforced by this court.   True, the
possession and the improvements in that case continued
after the twenty-sixth of March, 1836, when the pro-
hibition was removed ; but so, also, did the possession
and improvements in this case of Clay's.

Contrary, therefore, to this position of appellees'
counsel, the previous adjudications of this court not
only warrant, but require, that the acts of the parties,
anterior as well as subsequent to the twenty-sixth of
March, 1834, be taken into consideration in passing up-
on the equitable title, independent of the title bond.

In Clayton v. Frazier, 33 Texas, Mr. Justice Walker, delivering opinion, said : "Frazier could not be restored to his former position. He purchased the land for a home ; he has labored upon it the most of his lifetime ; improved it, and enhanced its value by his labor and improvements. All the thousand sacred associations of home cluster around it and about it. He has acted in good faith." How applicable this admirable language to the case of the present appellant !

WALKER, J.—The appellees brought the action of trespass to try title against the appellant, at the March term of the district court for the year 1851. Both parties deraign title from Nestor Clay, who died about the month of October, 1835.

The land in controversy is one-fourth of the headright league of Nestor Clay, who appears to have been the brother of Tacitus, the appellant.

It appears from the record that Nestor Clay derived his title through the Mexican government, by virtue of the colonization laws. His grant dates from the eighteenth of March, 1831.

The only paper muniment of title (subsequent to the headright grant) presented to the court by appellant is a paper called a title bond, and which in law must be so considered, though it is to some extent informal and somewhat ambiguous. This paper was executed on the fifteenth of May, 1830 ; the consideration named and receipted for was eighty dollars.

There is no contest as to the validity of the bond, nor as to the payment of the consideration named.

It appears from the evidence, that the appellant went into possession of the land in the year 1833 or 1334, by his agents. This possession has been continued since that time, and both the right of possession and the

actual pedal possession of the appellant appear to have been acquiesced in by Nestor Clay up to the time of his death.

It is true there is some evidence to show that he was in some way dissatisfied about the lines and corners of the tract in controversy. We think, however, that a true interpretation of this evidence tends strongly to establish the grant; for, while complaining of inaccuracy about the lines and corners, it can scarcely be doubted that he would have said something with regard to the grant, if he had considered it invalid, or had entertained any design of repudiating it. It appears that sometime in the year 1835, this tract was surveyed by one Brown, a surveyor employed by the appellant, and that Nestor Clay accompanied the surveying party, and from Brown's evidence it would appear that he was then satisfied with the survey. The appellant appears to have commenced making improvements of a permanent and valuable character immediately after he acquired possession, and as his brother Nestor lived until the month of October, 1835, the improvement must have been going on under his eye, as he lived upon the same headright. The jury appear to have estimated the improvements at $3000, and this estimate must have been low enough; for it would seem that about one-half the land was brought into cultivation; houses and out-houses, and all the necessary appliances of a comfortable home, have accumulated upon the land, and it is not disputed that all has been done through the industry and outlay of the appellant.

It is unnecessary to notice the pleadings, except so far as to say, that the appellant defended his title on equitable grounds and under the pleas of limitation.

By the colonization law applicable to the States of Coahuila and Texas, of 1825, colonists, such as Mr.

---

---

Clay, were prohibited selling the lands granted to them by the government, and this prohibition was not repealed until the twenty-sixth of March, 1834. His honor, the district judge, correctly stated this law to the jury, but he appears to have also stated a proposition in law to the jury which this court cannot endorse.

The Mexican law of 1825 was a prohibition upon the colonists alienating their lands, but we are not prepared to say that this was such a prohibition as actually to cut off and preclude all equity in the grantee, as against the grantor and his heirs. The effect of such an attempt at alienation would probably have been a forfeiture of the land to the government, which might, under a proceeding analogous to the inquest of office, have reclaimed the land and declared it vacant. No proceeding of this kind ever appears to have been taken against the land, or against any of the parties to this suit.

The Mexican law was not penal in its nature, in any other sense than that in which we have regarded it. The parties to a sale made in violation of its terms were doubtless so far offenders against the law. The law was intended to enforce a public policy—whether a wise one or not, is immaterial ; it is, however, certain that it would not have been regarded with much favor in a common law court, as it was a law in restraint of trade and commerce ; but of this law *quantum sufficit.* It is not in every case where parties have violated even the most wise and beneficial laws that courts of equity will determine that no equities can arise between them ; and after much consideration we are clearly of opinion that the case at bar is one of that class of cases in which the parties, though, in one sense, offenders against the law, as between themselves are not without equities.

The position assumed by the district court, that the title bond of 1830 is wholly void, and can have no legal

standing in a court of justice, is, in one sense, correct; and if the bond stood alone, without equities to support it, we should not hesitate in adopting the view of the district judge.

But the bond, although made in contravention of a law of the then existing government, opened the door to possession, occupation and improvement of the land; and the law itself being repealed in 1834, possession, occupation and improvement continued when there was no law against the alienation of the land by Nestor Clay; and he lived for a year or more after the inhibition had been removed, acquiescing in all his brother had been doing upon the land, uttering no word of complaint, or in derogation of the grant; thus practically and legally giving the contract of the fifteenth of May, 1830, a new date, to-wit, the twenty-sixth of March, 1834, the date of the repeal of the prohibitory law. The instruction of the court, that "no subsequent acknowledgment or recognition could give validity or binding force to it; there could not be a novation or renewal of a contract which was void because made in violation of express law," in its application to this case is manifestly erroneous, and would be in any analogous case. The only party in the world who could have had any right to interpose such a plea was the State, from which the title of Nestor Clay emanated. This was never done; and although it is not improper to refer this case to the determination of any law which existed and applied to the jurisdiction of the land and of the parties at the inception of appellant's title, it is fair to presume that the parties, brothers as they appear to have been, in fraternal fellowship, acted in good faith toward each other; and what could there have been in this repealed law of Mexico to have prevented

34—XXXV

them carrying out in good faith what they doubless intended in the beginning?

We are thus announcing no new principle of the law, but we are following close upon the footsteps of our most learned and able predecessors. The district judge regarded the contract of May 15, 1830, as an absolute nullity; and proceeding upon that theory of the law, his charge obviously misled the jury.

In Means v. Robinson, Chief Justice Hemphill, treating a similar question to that before us, and expounding the principles of the law as it existed prior to the revolution (7 Texas, 516), says:

"Absolute nullities were of two kinds, those resulting from stipulations derogating from the force of laws made for the preservation of public order, and those established for the interest of individuals. The former are not susceptible of ratification; but if, by subsequent dispositions of law, or by succession of time, such stipulations cease to be illegal, they may from that time be ratified." In the same case the learned Chief Justice quotes with approbation the following sentence from Febrero, to-wit: "The ratification of a void contract makes it a valid contract." It is true that a void contract can only be ratified and made valid after the condition which rendered it void has been removed. We have applied this doctrine to the case at bar, believing it to be well founded on the broad principles of equity and justice; but our opinion is further fortified by the case of Hunt v. Turner, 9 Texas, 385; by Mills v. Alexander, 21 Texas, 164; Wills v. Abbey, 27 Texas, 204. In Hunt v. Turner, Mr. Justice Lipscomb somewhat philosophically discusses this question, and with such ability as to challenge our profound admiration.

In the still earlier case of Dugan v. Colville, 8 Texas, 128, Mr. Justice Wheeler, in a very lucid opinion, lays

down the rule, that if the vendor permits the vendee to go in possession under a parol sale, and the vendee makes extensive and lasting improvements, relying upon the verbal promise of the vendor that he would make him a good title, an equity would arise in favor of the vendee, which a court of equity would not allow the statute of frauds to control or set aside.

These principles certainly apply with great force to the case at bar. Again, in the case of Williams v. Chandler, although the case is quoted by appellees' counsel as authority for the view they take of this case, the doctrine of ratification is clearly recognized; and we conceive that the only ground for the court not distinctly and fully stating in this case the rule as laid down in the other cases we have referred to, is found in the wide difference between the facts in that case from the others; and the implication in this case is clearly discernible that Williams's title would have been sustained by the court if accompanied by the equities which belong to the other cases, but to none more strongly than the case at bar.

The same remark will apply to the case of Hunt v. Robinson, 1 Texas, 748; yet we admit that taking merely the syllabus of this case into consideration, the practitioner would be misled. Indeed, Mr. Justice Lipscomb in that case appears to have inferred a doctrine from Chitty on Contracts, which appears to clash with his own subsequent opinions. Whether he meant to approbate the doctrine, as he understood it, does not clearly appear from the opinion. The learned judge recognizes the fact, that by the common law there was once a difference between the law which only forbid the doing an act, and the law which imposed a penalty for the breach. But he derives from Chitty the idea that this distinction was no longer recognized in the English

courts, making this remark: "The same authority will show that the distinction once attempted between things *mala prohibita* and *mala in se* cannot be sustained; that either invalidates a contract."

Our recent laborious examination of the case of Mills v. Raney (decided at the present term) has abundantly satisfied us that, however this doctrine may be regarded by the English courts, neither our own commentators nor jurists have so understood it. There is, however, in this opinion, a reference made to the case of McElyea v. Hayter, 2 Porter, 145, in which Chief Justice Safford remarks, "the principle is not necessarily the same as if, instead of this power (meaning a power of attorney to Campbell to convey the land to Hayter when the patent should issue), a bond for title had been executed at the same time, and McElyea had afterwards, when in possession of the patent, executed the deed pursuant to the previous void agreement. In this latter case, the subsequent execution of the conveyance would have constituted a new contract, when there was no restriction against it." It does appear that here is an acknowledgment of the power of Nestor Clay and his brother Tacitus to have renewed their contract, without any new consideration, after the law of 1825 was repealed; and if the appellant was then in possession, by his own pedal occupancy, or by that of his agents, and continued so, by and with the consent of his brother Nestor, such equities have grown up in his favor as no court of equity jurisdiction would be authorized in setting aside.

Both the land and the parties to this suit have passed under a new jurisdiction; and if the Mexican law of 1825 had never been repealed, we should not give it the same sanction, nor attach to its violation the same penalties, which we would feel bound to do were it a law

applicable to our own jurisdiction; nor can we look upon the act of the parties in attempting to evade that law as an act in any way detrimental to public policy—the breach of the law was simply *mala prohibita*. But we do not propose to put this case upon the ground that the repeal of the decree 190, in itself, gave validity to the contract of 1830; in other words, we do not assert that the subsequent repeal of a statute can validate a contract which was invalid whilst the law was in force.

In the case of Burleson v. Burleson, 11 Texas, it was contended that a new consideration was necessary to support the ratification of a contract for a sale of lands made by a colonist prior to the repeal of decree 190, but the court overruled this doctrine. This was a case very much like the one at bar, a contest between the heirs of one brother and their uncle. The heirs of Jacob Burleson stood very much in the position before the court in which now stands the appellant. The court upheld their equities; they and their father before them had been for a long time possessing and improving the lands which their uncle John had promised to convey to them; and although the original contract was void under the law of 1832, restraining the alienation of lands, the court upheld their title.

The opinion in this case was also delivered by Mr. Justice Lipscomb, who says, on page 9, "A party permitting such possession, so acquired and improvements made, raises an equity against him that will override his legal title. Such facts amount to a ratification of the covenant, and it is too late to say that it is not supported by a good consideration. Had there been no covenant shown, these facts would have raised the presumption of title to support the possession"; and the court here refers to the case of Lewis v. San Antonio, 7 Texas, 288. In this case the jury found against the appellant for the

rent of the premises for twenty-five years; thus long he was then in possession, improving and occupying, but his possession dates back to 1833 or 1834, a period of almost forty years.

We are referred to our own language, used in the case of Clayton v. Frazier, and we do not hesitate to adopt it in this case. The appellant must be an aged man; he purchased the land in his youth, at a time when, according to the evidence and the known history of the country, the consideration he paid for it was a fair equivalent. His labor and his means, aided by the subsequent development of the country, have no doubt greatly enhanced its value. The law does not say he must now give up this valuable, and no doubt cherished home, because he once bought it for the paltry sum of eighty dollars. Pronouncing upon the law as we understand it, and for the reasons given, the judgment of the district court is reversed, and the cause remanded, to be proceeded in in accordance with this opinion.

REVERSED AND REMANDED.