## M. D. Jones v. L. C. Huff.

1. A covenant to execute and deliver "a good and sufficient full and general "warranty deed" for land binds the obligor to make something more than a bare legal title. But if the title of the obligor, though imperfect as a legal title, be perfected by surrounding equities, so that his deed will convey a good and sufficient title in fee simple, then he is competent to perform his covenant.

2. In 1830, M. & M. brought to Texas from Tennessee one Morris and his family, paying all their expenses, and supplying them in Texas with money and provisions until they became able to provide for themselves; and in 1831 M. & M. procured for Morris from the Mexican authorities his colonial grant, and had the grant located and the land surveyed, paying all the government dues upon it; in consideration of all which, Morris then agreed to give M. & M. one-half of the land. Morris died in 1836, having continued until his death to recognize his contract with M. & M., and their right to half of his headright league; and after his death, his administrator, in 1837, by order of the probate court made a conveyance to M. & M., and some nine years thereafter there was an agreement for partition made by Morris's heirs with M. & M., by which agreement the heirs in effect confirmed their ancestor's contract of 1831. It further appears that M. & M. paid the taxes on their half, subsequent to 1838, and that from 1855 to the institution of this suit in 1868 the possession of the land was held under their title. *Held*, that though the original contract of Morris in 1831 was illegal and invalid, because made while he was subject to the prohibition against alienation, yet that the above facts suffice to establish a ratification or renewal of the contract, subsequent to the repeal of the prohibition by the decree of March 26th, 1834, and they also constitute an equitable title in M. & M. and their assigns, good and sufficient against the heirs of Morris. (Clay *v.* Clay, 35 Texas, 509, and cases therein cited, referred to by the court.) *Held further*, that the great lapse of time since the rendition of the decree by the probate court, in 1837, raises the presumption that such facts were before that court as authorized it to decree the conveyance by Morris's administrator to M. & M.; and therefore that conveyance is held to have vested the legal title also in them.

3. The proceedings of the courts in former times, on the faith of which property has been transmitted, should be upheld, whenever they can be upheld without violating established principles. (Kegans *v.* Allcorn, 9 Texas, 25, quoted.)

Appeal from Caldwell. Tried below before the Hon. Henry Maney.

In this case a jury was waived in the court below, and the facts as well as the law were submitted to the court. The material facts will be found in the opinion. Very able arguments were filed by counsel for the appellant and for the appellee, and the reporter regrets the want of space to preserve them in this report.

*Miller & Sayers*, and *Chandler, Carleton & Robertson*, for the appellant.

*T. M. Harwood*, for the appellee.

OGDEN, J. There is no question raised in the record, as to the contract, or obligation sued on. The note was executed in consideration for an obligation or bond for title to a certain tract of land. Suit was brought upon the note, and a tender of title made, which was claimed to be in full compliance with the bond. The defense set up to the suit on the note is, that the deed tendered was not such a deed as the plaintiff was bound to make ; that the plaintiff had no title to the land pretended to be conveyed, and could make no valid title. The only question therefore which requires an immediate examination is, as to the validity of that deed.

And as a preliminary step to that examination, it is to be understood that the obligors to that bond were, upon the payment of all the purchase money, to make, execute, and deliver to the obligee, his heirs or assigns, " a good and sufficient, full " and general warranty deed in fee simple for the land there- " inafter mentioned." This obligation would appear to bind the parties to execute something more than a bare legal title, since a legal title may exist without any interest, and may be greatly modified or limited by surrounding equities, and it is said that an equitable title will often override a legal one. (Hunt *v.* Turner, 9 Texas, 389.) We are therefore led to the conclusion, that it is wholly immaterial, so far as a just determination of this cause is concerned, whether the obligors in the

bond for title held a purely legal title, or whether their imperfect legal title had been perfected by surrounding equities, provided their deed would now convey a good and sufficient title in fee simple. There was, as has been said, no objection to the form of the deed tendered, but there was objection to the deed on the ground of the want of power in the grantor to make the deed tendered. And in this objection, it is believed all the merits of this case rest which need be noticed in this opinion.

The appellant in this cause, and one of the obligors in the title bond, claims title to the land in question by a regular chain of title from Mathews and McKean, whose title or claim of title originated in a bond for a deed to one half of a league of land granted to Spencer Morris by the Mexican government in 1831. This bond was given by Spencer Morris, the grantee, to Mathews and McKean and others, in consideration of certain advances made by them in money and provisions, and was executed in 1831. This bond, when executed, was in conflict with the laws of Mexico then in force, and consequently was invalid, and this court has repeatedly decided that, unless there were strong equities attendant upon the execution of the bond, or which have arisen since the repeal of the prohibitory law, such as a subsequent ratification or renewal of the obligation, possession and cultivation, or the like, such bonds must still be held as invalid.

Are there, then, any of these equities connected with the contract between Mathews and McKean and Spencer Morris, which would require a relaxation of the rule referred to? In 1830 Spencer Morris was a poor man in Tennessee, with a large family, and was anxious to come to Texas, but was without the means to pay the expense of his removal. Mathews and McKean brought him and his family to this country, paying all their expenses, and after their arrival supplied the family of Morris with money and provisions, until they were enabled to provide for themselves. They procured a grant from the Mexican government to Spencer Morris, for the league of which the land in question composed a part; had the same lo-

cated and surveyed, and paid all the government dues. And for this, Morris agreed to give them one-half of the league; and though this agreement was at the time prohibited by the Mexican laws, yet in 1834 those prohibitory laws were repealed, and still, according to the testimony of McKean, Spencer Morris continued to recognize the validity of his contract, and the rights of Mathews and McKean to the land. Spencer Morris lived two years after the repeal of the prohibitory laws. After Spencer Morris's death, in 1836, Mathews and McKean applied for a deed to the land, which was executed by the administrator, and nine years after, Mathews and McKean and the heirs of Spencer Morris entered into an agreement for the partition of the land. From this agreement it would appear that the heirs of Spencer Morris, ten years after the death of their ancestor, recognized and in effect confirmed the contract made with him in 1831. It is in proof that Mathews and McKean have paid the taxes on the half league since 1838, and it is also well established that the holder of the Mathews and McKean title have been in actual possession, cultivating and improving the same, since 1855.

It would seem from these facts that no stronger equities could be found in any case reported in the books, and it is believed that these facts are sufficient to raise a strong presumption of the recognition and ratification, if not a renewal, of the contract of 1831, after a repeal of the prohibitory laws in 1834; and under these circumstances, any ratification or renewal of that contract, subsequent to March, 1834, by Spencer Morris during his lifetime, or his heirs after his death, would render the same valid and binding on him and his heirs. (Means v. Robinson, 7 Texas, 510; Hunt v. Turner, 9 Texas, 386; Mills v. Alexander, 21 Texas, 160; Wills v. Abbey, 27 Texas, 203; and Clay v. Clay, 35 Texas, 509, decided at this term of the court.)

In the case of Hunt's heirs v. Robinson, Chief Justice Hemphill said, "The plaintiffs may have had rights founded on the "strongest equities, and if they have, such rights would be pro-"tected if fairly presented to the court." In the case at bar,

there are strong equities which have been accumulating for nearly forty years, and have been recognized by all parties in interest, until the institution of this suit, and we think they were properly presented, to call forth the protection of the court. In the case of Williams v. Chandler, which is greatly relied on by counsel for appellee, the court says: "The plaintiff is not "shown ever to have been in possession of the land, or ever to "have exercised acts of ownership respecting it; there was no " acquiescence in his right, of a character to affect his vendor, " for that implies adverse possession, or acts of ownership, to " which it must have reference." And we are of the opinion that case could not rightly form the basis of a rule for the government of this, but we are rather inclined, in this case, to follow the doctrine enunciated in the case of Wills v. Abbey, as having been established in former decisions, "that a contract " originally made in contravention of law would not necessarily "be set aside, where, after the removal of the legal inhibition, "there had been such acquiescence in the contract, and acknowl-" edgment or ratification of it, as to give rise to overpowering " equities in favor of the party claiming under it." We are therefore of the opinion that the appellant has established in herself such an overpowering equitable title, as to override any mere legal title in the heirs of Spencer Morris or their assigns.

But we are not quite sure that the appellant has not the legal as well as equitable title. After the death of Spencer Morris, in 1837, the probate court of Washington county, where the estate of Spencer Morris was being settled up, by a decree regularly entered upon its records, ordered the administrator to make to Mathews and McKean a deed for the one half league of land in controversy. This order of the probate court was made over thirty years prior to the institution of this suit, and but a short time subsequent to the death of Spencer Morris, when all the facts connected with the original bond of Morris were fresh within the memory of all parties interested; and it should be remembered that this order was directed to John Morris, the administrator, son, and heir of Spencer Morris, whose interest

would have induced him to make every effort to oppose the order, and defeat its execution, if the same had been an attempt to put in force an illegal and invalid contract.   There may have been facts before that court, bearing date subsequent to the removal of the legal inhibition, such as the verbal renewal of the bond by Spencer Morris, or by his heirs after his death, which would be sufficient to fully authorize a court of competent jurisdiction to have made the order.   And now, after the lapse of nearly forty years, the presumption that the court had such facts before it as would authorize a decree in favor of Mathews and McKean, would be almost incontrovertible.

.The only remaining question, therefore, which need be particularly noticed here is, had the probate court of Washington county, in 1837, legal authority to decree a specific performance of an .executory contract for the conveyance of land entered into by a person who had, subsequent to the execution of the contract, died, and whose estate was being probated and settled up in that county?   This question, in one form or another, has been frequently presented for the consideration of this court, and it is believed that it has been repeatedly decided, either directly or indirectly, in the affirmative. (Bohanau v. Hans, 26 Texas, 445; Box v. Lawrence, 14 Texas, 545; Shannon v. Taylor, 16 Texas, 419; Mills v. Alexander, 21 Texas, 154; Thompson v. Duncan, 1 Texas, 485; Menifee v. Hamilton, 32 Texas, 495.)   And in Kegans v. Allcorn, 9 Texas, 25, the court says: " The security of property, the repose of society, public policy " require, that the proceedings of the courts in former times, " under which rights were supposed to have vested, and on the " faith of which property has been transmitted, should be up- " held, whenever this may be done without doing violence to " the established principles and usages of the law."   We feel fully authorized, under the authority here cited, and the laws then in force, to decide that the County Court of Washington county, in 1837, did not transcend its authority in ordering the administrator of Spencer Morris to make title to Mathews and McKean, as shown by the record of that court; and if that

court had jurisdiction of the subject matter, then its orders must be regarded as a finality not to be impeached in a collateral proceeding, and to have settled the legality of the claim of Mathews and McKean, and the deed executed to them in conformity with the order of the court. We are, therefore, of the opinion that the appellant had at the time the contract with appellee was entered into, and at the institution of this suit, not only an equitable, but a legal title to the land which she proposed to convey, and that her deed for that purpose would convey a good and sufficient deed in fee simple, and that this was all the appellee had a right to ask.

We are of the opinion that the objections raised on the trial below, to the introduction of certain title papers, were obviated by the proof of execution, consideration, and record, and can now have no bearing on the merits of the case.

For the reasons given, we are of the opinion that there was error in the judgment of the District Court in decreeing a rescission of the contract, and that the same should be reversed and reformed, so as to give the appellant and plaintiff below a judgment for the amount as shown by the note sued on, and a decree foreclosing the vendor's lien, and an order of sale against the land described, to satisfy this judgment.

Reversed and reformed.